**PHILLIPS PETROLEUM COMPANY, Plaintiff,**

v.

**STOKES OIL COMPANY, INC., Fred Stokes, Jr., Joye R. Stokes, Camille B. Stokes, and Marine Transportation Company, Defendants.**

Civ. A. No. 82–0082–P(J).

United States District Court,
W.D. Kentucky,
Paducah Division.

May 30, 1986.

Richard C. Roberts, Whitlow, Roberts, Houston & Russell, Paducah, Ky., for plaintiff.

Goldstein & Price, St. Louis, Mo. and David Sparks, Williams Housman Sparks & Franklin, Paducah, Ky., for Marine Transport.

Michael Penick, Boehl Stopher Graves & Deindoerfer, Paducah, Ky. and Greg Rains, McMurry & Livingston, Paducah, Ky., for Stokes.

## MEMORANDUM OPINION

JOHNSTONE, Chief Judge.

This action arises out of a fire and explosion which occurred in the early morning hours of January 27, 1981, at Stokes Oil Terminal in Hickman, Kentucky. The fire destroyed several thousands of gallons of gasoline and part of the terminal. Plaintiff, Phillips Petroleum Company (Phillips), owned the gasoline that was destroyed and

brought this action to recover its loss against Marine Transportation Company (Marine), Stokes Oil Company, Inc. (Stokes), and three officers of Stokes, Fred Stokes, Jr., Joye R. Stokes, and Camille Stokes. Marine had transported the gasoline by barge to Stokes Oil Terminal where the disaster occurred, and Stokes owned and operated that terminal.

Phillips claims that defendants Marine and Stokes were negligent, that their negligence caused the fire and explosion, and that consequently, they are liable for the damaged gasoline. In addition, Phillips alleges that Stokes and its three defendant officers are liable for the entire loss under contracts which existed among those parties at the time of the loss.

Stokes counterclaimed against Phillips and cross-claimed against Marine for damages to its facility incurred during the fire and for indemnity from Marine for any sum it may be required to pay Phillips. Marine counterclaimed against Phillips and cross-claimed against Stokes for indemnity for any amount it may be required to pay any other party.

Jurisdiction over this action exists under 28 U.S.C. § 1332 and Rule 9(h) *Fed.R. Civ.P.*

This case was tried to the court without a jury, and after close of the evidence and the filing of post-trial memoranda by the parties, the court took the matter under consideration. After review of the record, the evidence adduced at trial, the memoranda of counsel, and the applicable law, the court makes the following findings of fact and conclusions of law pursuant to the requirements of Rule 52 Federal Rules of Civil Procedure.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the time of the fire Phillips and Stokes were parties to a contract under which Stokes received and stored at its terminal in Hickman, Kentucky petroleum products owned by Phillips. The contract provided that Stokes was responsible for all gasoline lost after delivery to the Stokes Terminal. The contract stated:

> Stokes shall supervise the unloading of such products from barges at the said facilities, ... and shall be solely responsible for all cost, expense, risks and losses ... in connection with each petroleum product ... from the time that such product passes the waterbourne transportation facilities into the shore unloading lines at the said facility until such product is reloaded into transport trucks and passes out of the possession ... of Stokes....

At the close of each contract year Stokes was required under the contract to account to Phillips for all products received at the facility. All products lost or unaccounted for were to be paid for by Stokes at a price per gallon equal to Phillips' established price per gallon for branded jobbers in effect at Hickman, Kentucky, on the date of the accounting or, to the extent the date of loss could be ascertained, the established price per gallon on the date of loss. The contract exempted losses resulting from fire or explosion not due to the negligence of Stokes.

In addition, Fred Stokes, Jr., Joye R. Stokes, and Camille Stokes entered into a contract with Phillips whereby they guaranteed Stokes' performance of the contract between Phillips and Stokes.

Finally, Phillips and Marine were parties to a different contract which required Marine to transport by river barge Phillips' gasoline from East St. Louis, Illinois to Stokes' terminal. The contract contained two provisions concerning which of the two parties would assume the risk of loss of the cargo. One required Phillips to obtain insurance on the cargo shipped by the Marine. The other provision was a *force majeure* clause which absolved Marine of liability for all losses unless the losses were caused by the personal design or neglect of the owner of Marine.

On January 26, 1986, in East St. Louis, Illinois Marine, pursuant to its contract with Phillips, loaded Phillips' gasoline into its barge, MTC 941, for conveyance to

Stokes Oil Terminal. MTC 941 contained ten cargo compartments, five on the starboard side numbered one, two, three, four, and five and five on the port side numbered in the same fashion. Compartments one and two port and starboard were filled with unleaded gasoline and compartments three, four, and five port and starboard contained house brand (leaded) gasoline. Each of the ten compartments was equipped with a valve which could be opened to allow gasoline to be pumped in or out, but which was supposed to be closed at all other times.

The evidence at trial indicated that the MTC 941, loaded with gasoline, traveled from East St. Louis to Hickman without incident and arrived at Stokes Oil Terminal at approximately 12:30 a.m. on January 27, 1981. The vessel was manned by Captain Gerald McKinney, tankermen Ray Enlow and Fred Robey, and three other employees. Enlow and Robey were responsible for unloading the cargo from the barge. They determined that the unleaded gasoline in compartments one and two would be discharged first. In order to pump the cargo out of those compartments, Robey opened their valves. Both Robey and Enlow testified that they checked the valves to the three, four and five compartments and found that they were closed.

At the terminal there were seven bulk tanks for storage of gasoline. Tanks one through five were encircled by a cinder block retaining wall. Products delivered to the terminal were transmitted to the storage tanks through two pipelines which extended from the top of the levee above the river to the water's edge. Each pipeline was controlled by a six inch gate valve located at the top of the levee which could be opened or closed to control the flow of product being discharged. The flow of gasoline to a particular tank could also be controlled by a valve located approximately two feet from the bottom of the tank.

Stokes Terminal and the setting for the fire appears on the aerial map admitted into evidence as exhibit number 30. Generally, the tanks were south of the shoreline and levee. East of shore tank there was a

house and lot owned by Mrs. Catherine Cashion. Her house was bound on all sides by Stokes' property; behind her property and northeast of tank three was a vacant lot owned by Stokes upon which grew some trees and brush. A black-top road separated the tanks from the vacant lot and the Cashion property.

On the night of the fire Cub Stokes, vice-president of Stokes, and Stokes employees, Raymond Forsythe and Levis Scarborough, were responsible for the discharge process on shore. Before the barge arrived they were informed by the terminal in East St. Louis that 160,272 gallons of unleaded gasoline and 344,862 gallons of house brand gasoline were being shipped to the Stokes facility. Based upon these figures Stokes decided to pump all the unleaded gasoline into shore tank three. That tank had a capacity of 200,000 gallons and contained 29,000 gallons prior to discharge; thus, Stokes assumed that it would hold the 160,272 gallons of unleaded gasoline from the barge.

Prior to the discharge, Enlow, Cub Stokes, and McKinney held a conference and verified that the unleaded gasoline would be pumped first. At the conference, Stokes received from the Marine employees a bill of lading and a cargo manifest which stated the amount of gasoline to be pumped that morning. Those amounts corresponded with the information Stokes had received from the terminal in East St. Louis.

The evidence at trial revealed that the pumping began at approximately 1:45 a.m. During the pumping of the gasoline into shore tank three, Cub Stokes, Scarborough, and Forsythe did not closely monitor the level of liquid in the tank. They spent most of their time in a company pick-up truck on the levee where their view of tank three was blocked by shore tank six. They did not take a gauging of the tank during the discharge. Once, Scarborough climbed to the top of the tank and checked the level of gasoline with a flashlight.

Approximately two hours after the discharge process began, the fire and explo-

sion occurred. Scarborough, Forsythe, and Cub Stokes all testified that while they were in the truck they noticed a small flame to the northeast of tank three which immediately shot up a tree and grew into a large fire. While Scarborough cut off the six inch valves on the levee, thereby stopping the flow of gasoline into tank three, Forsythe and Stokes ran toward the fire. All who witnessed the fire agreed that it spread practically instantaneously from a point outside the retaining wall, across the vacant lot owned by Stokes, and over the retaining wall to the tank. Stokes testified that he ran down the levee toward the fire and came into view of tank three. He saw that there was a small blueish-yellow flame which stretched from the tree which was in flames, across Stokes' property, over the retaining wall, and up the sides of shore tank three. Scarborough also testified that he saw yellow and green flames spread across the ground to the tank.

When the barge crew realized that there was fire, they stopped the pumps and pulled away from the shore.

The court concludes from all the credible evidence that the explosion resulted when the remains of a fire built by Stokes' employees came into contact with an overflow of gasoline which surrounded tank three. The crew of MTC 941 all testified that after the fire a gauger checked the amount of gasoline in the barge and discovered that there was a shortage in the compartments numbered five. Enlow checked the valves to compartments numbered five and found that they were open. This explained the overflow because if gasoline was being pumped from compartments one and two, and if during the pumping process the valves to the compartments numbered five were open, product would be pumped from the fives as well as from the ones and twos. Consequently, 184,448 gallons of gasoline were pumped into shore tank three. This amount was well beyond its capacity so several thousands of gallons spilled over the top of the tank and onto the ground.

The court finds that the gasoline was ignited by the remains of a debris fire built by Stokes' employees on the morning of January 26, 1981. On that morning Cub Stokes, Scarborough, and Forsythe started a fire in the lot behind the home of Mrs. Cashion. It was started in order to burn the remains of a house which had been on the lot and other debris which had been pushed together with a tractor. The court concludes that the Stokes personnel failed to adequately extinguish the fire. Although Cub Stokes testified that he doused the fire with water, Scarborough and Forsythe stated that they covered it with sand. All three men testified that the fire was out by 3:00 or 4:00; yet, Mrs. Cashion testified that she saw it burning at 6:00 p.m. when she passed it on her way to the market. Moreover, a visitor of Mrs. Cashion, Martha Warren, testified that she saw the fire burning at 5:30 a.m., and Mrs. Cashion testified that she saw the fire between 10:30 and 11:30 p.m. The contradictions in the testimony of Stokes' employees and the testimony of the two independent witnesses, Cashion and Warren, leads the court to the conclusion that the fire was left to burn unattended throughout the night and that it sparked the fire and explosion.

This conclusion is also supported by the fact that the path of the fire seen by Stokes' employees began at a point only one hundred yards from the debris fire. Additionally, Mrs. Cashion testified that when she awoke there was a fire that extended from an area near where the debris fire was located, across the vacant lot, and around tank three. Moreover, Mrs. Cashion stated that the fence which bordered the north of her property was burned by this fire, and that that border lies between the debris fire and the tanks.

The court finds that the damages sustained by Phillips were as follows. 78,112 gallons of house brand and 140,621.11 gallons of unleaded were destroyed in the fire. Of that gasoline, 63,084 gallons of house brand and 121,464 gallons of the unleaded were cargo, and the remaining 15,028 gallons of house brand and 19,157 gallons of

unleaded were non-cargo in that they were already stored at Stokes' Terminal before the night of the fire. After the fire 80,985 gallons of house brand evaporated due to the poor condition of Stokes' tanks as a result of the fire. The court's calculation of cargo lost is based upon the amount of gasoline loaded into MTC 941 for transport to Stokes' Terminal which did not return to East St. Louis. The evidence at trial indicated that all gasoline which was not unloaded at Stokes' Terminal returned to the East St. Louis terminal; therefore, all that did not return must have been destroyed in the fire and explosion.

At the time of the fire the price Phillips charged branded jobbers in Hickman, Kentucky was $1.0095 per gallon for house brand and $1.0495 per gallon for unleaded. At the time of accounting, the price charged for house brand was $1.0295.

The court concludes that the fire and ultimate loss of gasoline and damage to the terminal were caused by a combination of the negligence of Marine and the negligence of Stokes.

■ Marine failed to use ordinary care in inspecting the compartment valves and in unloading the amount of cargo specified on the manifest. It was Marine's duty to monitor the compartments and valves during the off-loading process. The evidence conclusively indicated that the valves could not have opened accidently. Someone on the barge must have opened them either intentionally or by mistake. That person was either working for Marine, or on the barge and thus, within the control of Marine. Moreover, if Marine employees had more closely monitored the valves, they would have discovered that they were open and could have closed them before there was an overflow.

In addition, it was the duty of Marine to pump the amount of gasoline reflected on the manifest. Marine's personnel controlled the flow of gasoline out of the compartments, onto shore, and into the tank. If Marine had pumped only the amount of gasoline indicated on the manifest, then there would not have been an overflow.

Thus, Marine's failure to adequately check the valves and to pump the right amount of gasoline was a proximate cause of the overflow and the subsequent fire.

■ Stokes was also negligent during the off-loading procedure. It had a duty to closely monitor the tanks during the discharge and to often inspect the level of gasoline in shore tank three. The expert evidence indicated that in a situation such as the one presented here where the tank is expected to be filled to within ninety percent of its capacity, shoremen should closely watch tanks as they are filled. Indeed, they should be checked once every thirty to forty minutes to insure that they do not overflow. Yet, the tank was checked only once by Stokes personnel. Consequently, Stokes failed to exercise ordinary care in monitoring the flow of gasoline into the tank and such failure was a proximate cause of the overflow and fire.

■ Moreover, Stokes violated Kentucky statutes and regulations in its monitoring of the tank. KRS 227.300(1) gives the Commissioner of Insurance of Kentucky the authority to promulgate regulations in Kentucky. Such regulations have the force of statutory law. 815 KAR 10:020 § 4.(2)(c) adopts the National Fire Association Pamphlet 30, "Flammable and Combustible Liquids Code." The Code required Stokes to frequently gauge the tank while it was being filled and to have a bell that rang as the tank neared being full. Stokes violated both of these requirements. Such violations are presumed to have been a cause of the fire unless Stokes proves that they could not have caused the fire. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874); *Skidmore v. Grueninger,* 506 F.2d 716 (5th Cir.1975). Here, failure to comply with the regulations was a cause of the fire; thus, Stokes cannot overcome the presumption.

■ As the court found earlier, the source of the fire and explosion was the brush fire built by Stokes' employees. Stokes' failure to use due care in extinguishing the fire was also a substantial

cause of the fire that destroyed the gasoline. This negligence was especially egregious in light of the fact that the Stokes' employees who built the fire and left it burning did so with knowledge that there were thousands of gallons of flammable liquid close by, and that there would be gasoline loaded off the barge and into the tanks that night. In addition, Stokes violated Hickman City Ordinance 10.56 by burning trash on the day of the fire without the permission of the City of Hickman Fire Chief. Again, such violations are presumed to have caused the loss unless proven otherwise, *Id*, and Stokes has failed to prove otherwise.

■ Accordingly, the fire and loss were caused by the concurrent negligence of Marine and Stokes, and Phillips is entitled to recover its damages from them. Under admiralty law when the negligence of two parties is concurrent in causing the loss, damages are to be allocated among the parties proportionately to their comparative degree of fault. *Kinsman Marine Transit Co. v. Great Lakes Towing Company*, 532 F.2d 1073 (6th Cir.1976). The court concludes that Stokes' negligence was responsible for the greatest portion of the loss caused by the fire. Therefore, the court attributes 75% of the fault to Stokes and 25% of the fault to Marine.

■ Although Marine was 25% at fault for the fire, its contract with Phillips limits its liability to damages to product which was not cargo. By summary judgment entered July 11, 1984, this court ruled that the provision of the contract between Phillips and Marine which required Phillips to maintain insurance on all cargo indicated that the parties intended Phillips to bear the risk of loss of the cargo. Thus, the contract precluded Phillips from recovering lost cargo from Marine. The court concluded that lost cargo included all the gasoline which was being discharged from MTC 941 into tank three. Consequently, Marine's liability to Phillips is limited by contract to damages to gasoline already stored in tank three when the discharge process began.

■ Marine argues that the *force majeure* clause precludes Phillips from recovering even for non-cargo. The court does not agree. In its July 11, 1984 memorandum opinion and order the court ruled that Marine bore the burden of proving that the losses were not caused by the personal design or neglect of the owner of Marine. The court finds that Marine failed to carry that burden at trial. Therefore, Marine is liable for the loss of non-cargo.

■ Stokes is liable to Phillips in contract as well as in tort. Under the contract between Phillips and Stokes, Stokes is liable for all gasoline lost after delivery to the Stokes' Terminal unless such loss was through fire not caused by Stokes' negligence. Because the fire was caused in part by Stokes' negligence, Stokes is liable for the loss under the contract.

■ Stokes argues that the contract was modified by a letter and the modification released Stokes from any claims against it by Phillips. At trial the court sustained Phillips' objection to introduction of the letter, but it permitted admission of the letter by avowal. Stokes asks the court to vacate its ruling and consider the letter. Stokes neglected to include the letter in its pre-trial list of exhibits or to otherwise provide it to Phillips before trial. In the pre-trial order, the parties were advised that in the absence of good cause shown no exhibit would be admitted unless included in its pre-trial list. Stokes has failed to make a showing of good cause for its neglect. Therefore, the court will affirm its trial ruling and not consider the letter. Because the contract was not modified, Stokes is liable in contract for all gasoline delivered to its terminal and then destroyed.

■ Stokes claims that it is not responsible for the fuel lost due to evaporation because it would have been saved if Phillips had mitigated its damages by retrieving its product before it evaporated. There was little evidence of failure to mitigate at trial. Stokes simply claims that it told

Phillips that the tanks were damaged; thus, it could have saved the product. Stokes also notes that Phillips is a wealthier corporation than Stokes and it was consequently in a superior position to remove the gasoline. The court finds that these facts and allegations are insufficient to prove failure to mitigate. Thus, Stokes is responsible for all the gasoline lost whether by fire or by evaporation.

Although the parties agree that under a contract theory of recovery, Phillips' damages are determined by the terms of the contract, they do not agree upon the appropriate method for determining the value of the gasoline lost under a negligence theory of recovery. Stokes argues that the value of the lost gasoline was equivalent to its cost of production, and Phillips argues that its value was the price Phillips would have received for the product on the spot market. The court rejects each of these theories and concludes that the price for lost gasoline agreed upon by Stokes and Phillips in their contract is the most conclusive evidence of the market value of the product lost as a result of the fire. This is a good measure of the gasoline's market value because it reflects what a willing buyer will pay a willing seller in the open market. Moreover, by using this method of calculation of damages, the court avoids inconsistency in its awards of damages under Phillips' tort and contract theories of recovery.

Stokes claims that the cargo lost in the fire was all house brand when it entered Stokes Oil Terminal, and that it should be liable only for the house brand price. The court agrees. Stokes was not responsible for the mixing of the gasoline on the barge. That was solely caused by the negligence of Marine in leaving open the valves. Because this particular ruling deals only with damages for loss of cargo, no adjustment will be necessary in calculating Marine's liability.

Accordingly, the court finds that Phillips' damages are as follows: 184,548 gallons of house brand/cargo at $1.0095;

15,028 of housebrand stored before the fire at $1.0095; 19,157.11 of unleaded stored before the fire at $1.0495; and 80,958 gallons of housebrand at $1.0295. Stokes is liable for that entire amount in contract. In tort, 75% of the damages are apportioned to Stokes and 25% are apportioned to Marine with the exception that Marine is not liable for the loss of any cargo. Of course, Phillips is entitled to only one recovery. Therefore, if it recovers from Stokes in contract for its entire loss, it cannot recover from Marine. Instead, Stokes will they have a right of indemnity from Marine as is more fully set forth below.

Phillips also seeks as damages $7,288.63 for a state tax it paid on the gasoline. The court denies this claim. Phillips would have been required to pay this tax whether or not Stokes and Marine had been negligent. Moreover, Phillips will receive as damages the market value of the gasoline which was destroyed. Any more compensation for the loss of the gasoline would be a windfall to Phillips.

The court finds that plaintiff is entitled to pre-judgment interest on the damage award. Pre-judgment interest is to be awarded in an admiralty case unless special circumstances dictate otherwise. *Cargill, Inc. v. Taylor Towing Service, Inc.*, 642 F.2d 239 (8th Cir.1981). No exceptional circumstances exist in this case. Thus, interest will be allowed from the date of the fire and explosion at a rate of 11% per annum.

Under the contract they entered with Phillips the defendant officers of Stokes, Fred Stokes, Jr., Joye R. Stokes, and Camille Stokes, individually guaranteed performance of the contract between Stokes and Phillips. Consequently, they are individually liable for the damages owed Phillips by Stokes under their contract.

Stokes has a cross-claim against Marine for damages to its terminal. Because Marine was 25% at fault for the fire and explosion, the court finds that Ma-

rine is liable for 25% of the damages to Stokes terminal which were caused by the fire. The appropriate measure of damages for Stokes' terminal is the cost of repairing the terminal. *Tug June S v. Bordagain Shipping Company,* 418 F.2d 306 (5th Cir. 1969). The evidence supports Stokes' claim that $202,532.02 was the cost of repair. The court finds that that sum is reasonable and will award Stokes 25% of that amount. To this amount pre-judgment interest, to be calculated from the date of the accident, will be added at a rate of 11% per annum.

Stokes claims lost profits resulting from the fire. However, because Stokes failed to adequately establish such loss, the court will not award it lost profits.

■■■ Stokes also has a cross-claim against Marine for indemnity for any amount Stokes must pay Phillips. Marine argues that Stokes breached an implied warranty of workmanlike performance and that in cases of such breach there can be no indemnity. Crucial elements in the breach are a contract by which a shipowner relies on the expertise of another to perform services without his supervision and control; and the improper execution of those services which would foreseeably render the vessel unseaworthy thereby exposing the shipowner to liability. *Fairmont Shipping Corp. v. Chevron International Oil Co., Inc.,* 511 F.2d 1252 (2d Cir.1975). In this case the unloading of the gasoline, the overflow, and the fire were not beyond the control of Marine. It was intimately involved in the process. Therefore, one element of breach of workmanlike performance has not been established by Marine. Therefore, the court finds in favor of Stokes on its claim for indemnity. However, the court notes that this claim for indemnity comes into play only if Stokes pays Phillips an amount greater than the 75% of damages for which Stokes is liable in tort.

Marine claims that under its contract with Phillips, Phillips must indemnify it for any amount it pays Stokes. The court has ruled to the contrary in its summary judgment opinion and order of July 11, 1984.

Therefore, the court finds in favor of Phillips on Marine's counter-claim against it. Marine also has a cross-claim against Stokes for indemnity for any amount it must pay Phillips. Because the defendants' liability in tort is already apportioned, Marine's cross-claim will be dismissed.

Stokes has presented no evidence to support its counterclaim against Phillips. Thus, the court finds in favor of Phillips on that claim.

## CONCLUSION

In summary, on Phillips' complaint the court will enter judgment in favor of Phillips and against the defendants. Phillips' damages are $304,923 plus pre-judgment interest. In contract, Stokes and the three defendant officers are liable for the entire amount. In negligence, Stokes and Marine are liable for the entire amount except that Marine's liability is limited to loss of non-cargo, or $118,479.65.

75% of the damages are attributable to the fault of Stokes and 25% are attributable to the fault of Marine.

On Stokes' cross-claim against Marine, the court will enter judgment in favor of Stokes and against Marine in the amount of $50,633. The court will also enter judgment in favor of Stokes and against Marine on Stokes' claim for indemnity.

On Marine's claims against Phillips and Stokes, the court will enter judgment in favor of Phillips and Stokes. Also, the court will find against Stokes on its claim against Phillips.

An appropriate order will accompany this memorandum.