PHILLIPS PETROLEUM
COMPANY, Plaintiff,

v.

STOKES OIL COMPANY, INC., Defendant–Appellant (87–5444), Defendant–Appellee (87–5468),

and

Marine Transportation Company, Defendant–Appellee (87–5444), Defendant–Appellant (87–5468).

Nos. 87–5444, 87–5468.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 16, 1988.

Decided Dec. 12, 1988.

Robert Nienhuis, John R. Halpern (argued), Goldstein and Price, St. Louis, Mo., for Marine Transp. Co.

Michael P. Penick, Boehl, Stopher, Graves, Deindoerfer, M. Greg Rains (argued), Paducah, Ky., for Stokes Oil Co., Inc.

Before JONES and RYAN, Circuit Judges, and HULL, District Judge.*

RYAN, Circuit Judge.

This is an appeal and cross-appeal from judgments entered below in this litigation growing out of a fire that occurred on January 27, 1981 in a gasoline storage facility in Hickman, Kentucky.

The issues raised by the appellants and cross-appellants are whether the trial court erred in

1. apportioning liability,
2. rejecting a claim of implied warranty of workmanlike performance,
3. admitting certain documentary evidence,
4. determining damages, and
5. awarding pre-judgment interest.

We find no error affecting the district court's judgments, and we affirm.

---

**I.**

The plaintiff, Phillips Petroleum Company, had a contract with defendant-appellant Stokes Oil Company, Inc. under which Stokes received large quantities of petroleum products from Phillips and stored them at Stokes' terminal facility in Hickman, Kentucky. Phillips also had a contract with Marine Transportation Company by which Marine was required to transport Phillips' gasoline by river barge from East St. Louis, Illinois to Stokes' terminal in Kentucky.

On January 26, 1981 in East St. Louis, Illinois, Marine loaded Phillips' gasoline into ten gasoline storage compartments aboard its barge, MTC 941. The barge then proceeded to Stokes' oil terminal in Hickman, Kentucky. Unleaded gasoline filled four of the compartments and leaded gasoline filled the remaining six. Each compartment was equipped with a valve that when opened, would permit gasoline to be pumped in or out. At all other times the valves were supposed to remain closed. Gerald McKinney captained the barge; tankermen Ray Enlow and Fred Robey were responsible for unloading its cargo of fuel.

The district court found that "Cub Stokes, vice-president of Stokes, and Stokes' employees Raymond Forsythe and Levis Scarborough were responsible for the discharge process." *Id. Phillips Petroleum Co. v. Stokes Oil Co.*, 639 F.Supp. 291, 295 (1986). The terminal in East St. Louis had previously informed the Stokes employees that the MTC 941 was on its way to the Stokes terminal containing 160,272 gallons of unleaded and 344,862 gallons of leaded gasoline. Based upon this information, Stokes decided to pump all of the unleaded gasoline into shore tank number three. Because that tank had a capacity of 200,000 gallons and currently contained 29,-000 gallons, Stokes assumed that it would hold the 160,272 gallons of unleaded gasoline from the barge.

---

* The Honorable Thomas G. Hull, Chief Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation.

MTC 941 arrived at Stokes' oil terminal at approximately 12:30 a.m. on January 27, 1981. The barge crew began pumping the unleaded gasoline into shore tank number three about an hour later. From the evidence adduced at trial, the district court found:

During the pumping of the gasoline into shore tank three, Cub Stokes, Scarborough, and Forsythe did not closely monitor the level of liquid in the tank. They spent most of their time in a company pick-up truck on the levee where their view of tank three was blocked by shore tank six. They did not take a gauging of the tank during the discharge. Once, Scarborough climbed to the top of the tank and checked the level of gasoline with a flashlight.

Unknown to all at the time of the pumping, the valve to one of the barge compartments containing leaded gasoline was also open. As a result, the barge pumped 184,448 gallons of gasoline into shore tank three, an amount well in excess of the tank's capacity. As a result, several thousand gallons of gasoline spilled out of the top of the tank and onto the ground. Approximately two hours after the pumping began, the overflowing gasoline ignited, consuming several thousand gallons of Phillips' gasoline and resulting in substantial damage to the Stokes Terminal.

The trial court found that "the remains of a fire built by Stokes' employees" on a lot adjacent to the terminal on the morning of January 26, 1981 ignited the gasoline. The employees built the fire in order to dispose of debris, including remains of a house that had been razed on the property earlier. Cub Stokes testified that he used water to extinguish the fire, but Scarborough and Forsythe stated they had covered it only with sand. All three testified that the debris fire had been extinguished by 3:00 or 4:00 p.m., yet others testified that it continued to burn late into the evening.

## II.

Claiming that Marine and Stokes were negligent, Phillips sued for recovery of the value of its lost gasoline. Phillips also alleged that Stokes and its three defendant officers were contractually liable for the loss. Stokes counterclaimed against Phillips and cross-claimed against Marine for their respective negligence in contributing to the cause of the fire that also heavily damaged Stokes' facility. Stokes also sought indemnification from Marine for any sum the court might require it to pay to Phillips. Marine counterclaimed against Phillips and cross-claimed against Stokes, seeking indemnification for any amount the court might require that it pay another party.

The trial court found that "the fire and ultimate loss of gasoline and damage to the terminal was caused by a combination of the negligence of Marine and the negligence of Stokes." 639 F.Supp. at 297. Marine was found negligent for "failure to adequately check the valves and to pump the right amount of gasoline, [which] was a proximate cause of the overflow and the subsequent fire." *Id.* The court found that Stokes was negligent for failing to monitor the flow of gasoline into the tank, for violating Kentucky Revised Statute 227.300(1) which required certain safety measures relating to the transfer of flammable liquids, and for failing to extinguish the debris fire that ignited the gasoline, all of which were a proximate cause of the explosion and fire.

The trial court calculated Phillips' lost fuel damages to be $304,923.60 and held Stokes liable for that entire amount based upon its contract with Phillips. Further, the district court found Stokes to have been seventy-five percent negligent and Marine twenty-five percent negligent in causing the fire, and apportioned the damages payable to Phillips accordingly. The court then stated:

Of course, Phillips is entitled to only one recovery. Therefore, if it recovers from Stokes in contract for its entire loss, it cannot recover from Marine. Instead, Stokes will have a right of indemnity from Marine....

639 F.Supp. at 299. The court also concluded that the evidence supported Stokes' claim that the damage to the terminal was

$202,532.02 and awarded Stokes twenty-five percent of that amount from Marine. The court added prejudgment interest, calculated from the date of the accident, of eleven percent per annum to each damage award.

Stokes and Marine have taken an appeal and cross-appeal respectively. Stokes appeals the trial court's apportionment of fault between itself and Marine. Marine appeals the trial court's award of damages to Stokes, its refusal to apply a warranty of workmanlike performance, the admission of certain documentary evidence, the determination of damages, and the award of prejudgment interest. We take up each assignment of error in turn.

### III.

### Apportionment of Liability

Stokes claims the district court erred in apportioning seventy-five percent of responsibility for the fire to Stokes and twenty-five percent to Marine. Its argument is based upon the theory that: 1) the evidence does not support the district court's finding that Stokes' employees negligently failed to extinguish the debris fire that was the source of ignition for the explosion, and 2) the court applied the wrong standard of care to Stokes' obligation to monitor the shore tank.

In *United States v. Paducah Towing Co.*, 692 F.2d 412 (6th Cir.1982), this court stated the standard of review in an admiralty case as follows:

> The district court's findings of fact in an admiralty proceeding may not be set aside unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). Under this limited standard of review, we will reverse a decision if we are left with the firm conviction that the district court has made a mistake. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Alexander v. Youngstown Board of Education*, 675 F.2d 787, 795 (6th Cir.1982); *Johnson v. United States*, 600 F.2d 1218, 1222 (6th Cir.1979). We must review the entire record and set aside a

district court's finding of negligence if there is clear error in its decision. *See McAllister*, 348 U.S. at 20–21, 75 S.Ct. at 7–8; *Ingram Corp. v. Ohio River Co.*, 505 F.2d 1364, 1369 (6th Cir.1974).

> Although an appellate court will not overturn a district court's finding of negligence unless clearly erroneous, a court of appeals is not so restricted when it considers whether the district court properly defined the standard of care used to evaluate the conduct of the parties. That presents a question of law. In determining the proper standard of care, therefore, we may freely review the district court's conclusions.

692 F.2d at 421–22.

■ Based on the trial testimony, we cannot agree with Stokes that the district court's finding that the debris fire started by Stokes' employees was the source of ignition was clearly erroneous. There was conflicting testimony whether the debris fire had been extinguished by Stokes' employees or, as the trial court put it, "was left to burn unattended throughout the night...." The district court chose to credit the testimony of disinterested witnesses who claimed the debris fire was not extinguished. The court's finding that the debris fire was the source of ignition is supported by the evidence concerning the path of the fire from the area of the smoldering debris to the gasoline storage tank, and the testimony of neighbors who claimed to have seen the debris smoldering between 10:30 p.m. and 11:30 p.m. on January 26.

■ The district court also found that Stokes negligently failed to monitor the unloading process in a manner consistent with standards set forth in a regulation issued by the Kentucky Commission of Insurance. Pursuant to Ky.Rev.Stat. § 227.300, such regulations have statutory authority. The relevant regulation, 815 KAR § 10:020, adopts Pamphlet 30, "Flammable and Combustible Liquids Code," of the National Fire Association. The regulation specifies that:

Tanks receiving transfer of Class I liquids from mainline pipelines or marine vessels and located in an area where overfilling may endanger a place of habitation or public assembly shall be either:

(a) Gauged at frequent intervals while receiving transfer of product and communications maintained with mainline pipeline or marine personnel so that flow can be promptly shut down or diverted, or

(b) Equipped with an independent high level alarm located where personnel are on duty during the transfer and can promptly arrange for flow stoppage or diversion, or

(c) Equipped with an independent high level alarm system that will automatically shut down or divert flow.

Pamphlet 30 § 2–9.

■ Stokes does not dispute that it failed to comply with parts (b) and (c) of the regulation. It is also clear that Stokes did not "gauge the tank at frequent intervals" and maintain communications so that the flow could have been promptly shut down or diverted. As the district court concluded, checking the tanks once forty-five minutes prior to the overflow was not compliance. The regulation clearly requires close supervision so that an overflow could be averted. It was not error for the district court to conclude that Stokes had failed to comply with the regulation.

Stokes argues that it should not be required to follow the procedures in the regulation because it had previously calculated that tank number three could easily hold the unleaded gasoline the parties had intended to pump into it. This argument is without merit. The regulation clearly provides for either close monitoring, automatic shut-off, or an alarm located where workers will hear it, regardless of whether prepumping calculations indicate little risk of overflow. The statute requires close monitoring or automatic shut-off devices precisely to mitigate the harmful effects of miscalculation or, in this case, pumping errors.

■ Damages in admiralty cases are generally allocated among tortfeasors based on comparative fault. *Kinsman Marine Transit Co. v. Great Lakes Towing Co.*, 532 F.2d 1073, 1074 (6th Cir.1976). Because we review negligence determinations under the clearly erroneous standard, we likewise review the allocation of fault under that standard. *See, Paducah Towing Co.*, 692 F.2d at 421. Based on the district court's findings that Marine negligently failed to monitor the barge valves and the pumping from the barge compartments, that Stokes negligently failed to monitor the receiving tank, and that Stokes' negligent failure to extinguish the fire that was the ignition source for the fire, the apportionment of seventy-five percent of the fault to Stokes and twenty-five to Marine is not clearly erroneous. Stokes' negligence contributed to the overflow and created the ignition source. Moreover, Stokes had a duty to monitor the pumping process to prevent an overflow regardless of Marine's negligence. Stokes was in a position to have caught Marine's mistake and prevented the overflow entirely. These facts support the district court's decision to allocate seventy-five percent of the fault to Stokes.

### Implied Warranty of Workmanlike Performance

■ Marine cross-appeals the trial court's finding that the warranty of workmanlike performance had no application to Stokes' recovery against Marine for twenty-five percent of the cost of the lost fuel. But Marine has not provided, nor have we found, any convincing authority for extending the warranty to indemnification for property damage.

Courts have applied the warranty of workmanlike performance to cases involving indemnification between a shipowner and a subcontractor for personal injuries sustained by third parties. *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), is the landmark case. In *Ryan*, an employee of a stevedoring company was injured while working aboard a ship. He sought and was awarded recovery against the shipowners for his injuries. The ship-

owners filed a third-party complaint against the stevedoring company, with which it had a contract for unloading the vessel's cargo. The Supreme Court held that a stevedoring company's promise to perform services for a shipowner carried with it an implied agreement to indemnify the shipowner for damages caused by the personal injury to the stevedore company's employee. The Court held that the stevedoring company's contract included an implied promise to perform the work in a reasonably safe manner. The Court held that the stevedoring company's failure to perform the work in a reasonably safe manner breached the implied warranty, causing the employee's injury and the shipowner's resulting liability. Therefore, the Court required the stevedoring company to indemnify the shipowner for its liability to the injured employee.

The Court in *Ryan* did not clearly explain its rationale for creating an implied warranty of workmanlike performance, but two later Supreme Court decisions strongly indicate that the basis for the implied warranty is the strict liability seaworthiness doctrine that admiralty law imposes upon the shipowner.[1] *Waterman S.S. Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 425, 81 S.Ct. 200, 202, 5 L.Ed.2d 169 (1960); *Italia Societa Per Azioni di Navigazione v. Oregon Stevedoring Co., Inc.*, 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964). In *Italia Societa* the Court wrote:

> Where the shipowner is liable to the employees of the stevedore company as well as its employees for failing to supply a vessel and equipment free of defects, *regardless of negligence*, we do not think it unfair or unwise to require the stevedore to indemnify the shipowner for damages sustained as a result of injury-producing defective equipment supplied by a stevedore in furtherance of its contractual obligations.

376 U.S. at 324, 84 S.Ct. at 754 (emphasis added, citations omitted).

This and other circuits have similarly concluded that the Supreme Court based its *Ryan* holding of an implied warranty of workmanlike performance on the nondelegable duty of the shipowner that is imposed by the seaworthiness doctrine. *See Liberty Mutual Ins. Co. v. Fruehauf Corp.*, 472 F.2d 69, 70–71 (6th Cir.1972); *Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270, 276 (2d Cir.1968); *Hobart v. Sohio Petroleum Co.*, 445 F.2d 435, 438 (5th Cir.), *cert. denied*, 404 U.S. 942, 92 S.Ct. 288, 30 L.Ed.2d 256 (1971); *Davis v. Chas. Kurz & Co., Inc.*, 483 F.2d 184, 187 (9th Cir.1973); *Barr v. Brezina Construction Co.*, 464 F.2d 1141, 1145 (10th Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973); *Smith & Kelly Co. v. S.S. Concordia Tadj*, 718 F.2d 1022, 1028 (11th Cir.1983). Each one of these cases involved a claim for personal injuries.

■ Although in *Master Shipping Agency, Inc. v. M.S. Farida*, 571 F.2d 131, 133 (2d Cir.1978), the Second Circuit once extended the *Ryan* doctrine into a property damage situation, more recently that circuit applied joint tortfeasor contribution principles and did not permit one party to avoid cargo damage liability by arguing breach of a warranty of workmanlike performance. *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 625–26 (2d Cir.1980). Likewise, the Fifth Circuit has expressed reluctance to extend *Ryan* beyond personal injury actions. In *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096 (5th Cir. 1981), the court concluded that "[d]isputes between vessels and stevedores over damaged cargo are best accommodated by a straightforward application of the usual maritime comparative fault system." 651 F.2d at 1100. We agree. While the doctrine of seaworthiness, upon which the

---

1. First announced by the Supreme Court in *The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), the admiralty doctrine of seaworthiness holds a shipowner strictly liable for injuries to seamen who are injured because of the ship's unseaworthiness. The doctrine imposes an ab-

solute, nondelegable duty. *Hobart v. Sohio Petroleum Co.*, 445 F.2d 435, 439 (5th Cir.1971); *Ballwanz v. Isthmian Lines, Inc.*, 319 F.2d 457 (4th Cir.1963), *cert. denied*, 376 U.S. 970, 84 S.Ct. 1136, 12 L.Ed.2d 84 (1964).

*Ryan* holding is based, holds a vessel owner strictly liable for seamen's personal injuries resulting from an unseaworthy condition, the seaworthiness doctrine does not hold a shipowner strictly liable for damage to cargo. Liable only for property damage, Marine was never exposed to the strict liability principle of the seaworthiness doctrine. Marine has no basis for invoking a *Ryan* indemnification.

### Admission of Evidence

█ Marine appeals the district court's decision to admit two documentary exhibits, bids to repair damaged areas of the terminal, offered by Stokes to prove damages. Marine claims the two exhibits were hearsay not falling within any applicable exception because the bid preparers did not testify as to any of the foundation facts necessary to qualify the documents as business records under the Federal Rules of Evidence. We need not confront the hearsay issue, however, because Marine's objection to admission was not timely. "[T]he district court has broad discretion in determining the relevancy and admissibility of evidence," and the "court's rulings on evidentiary matters will only be reversed on a clear showing of abuse of discretion." *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th Cir.), *cert. denied,* ── U.S. ──, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987). The district court's pretrial order provided that it would admit all exhibits into evidence unless a party filed a written objection before trial. In its request for production of documents, Stokes provided Marine with both bid documents. In its pretrial statement, Stokes indicated its intent to introduce both documents at trial. Marine failed to object to the introduction of the bids before the trial. If Marine had objected before trial, Stokes could have secured the necessary foundation testimony. We conclude, therefore, that Marine waived any objection to the exhibits.

### Measuring Damages

Marine also appeals the district court's calculation of damages to the Stokes Terminal facility. Marine argues that the district court should have applied a fair market value rather than a cost of repair standard.

█ Because Marine's crew was found to have proximately contributed to the cause of the gasoline fire that destroyed part of the terminal, the damage issue falls within admiralty jurisdiction. In admiralty cases, however, the substantive rules concerning damages do not generally differ from the common law: as a general proposition, courts award admiralty damages to make injured parties whole. *See, e.g., Shepard S.S. Co. v. United States*, 111 F.2d 110, 113 (2d Cir.1940) (citing *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1925)); *Tug June S v. Bordagain Shipping Co.*, 418 F.2d 306, 307 (5th Cir.1969). Where vessels are damaged in marine accidents, the law permits owners to recover the reasonable cost of repair even though such repair may place the owners in a better position by providing them with new materials for old. *The Baltimore*, 8 Wall 377, 75 U.S. 377, 386, 19 L.Ed. 463 (1869); *Shepard S.S. Co. v. United States*, 111 F.2d 110, 113 (2d Cir.1940). If property is so badly damaged that the cost of repair exceeds the fair market value of the property just before the damage, the law considers the property destroyed. If property is destroyed it is not reasonable to attempt repair and a fair market value calculation then becomes proper.

█ Marine correctly argues that the award for cost of repair should be limited to the cost of repairing the terminal facility to restore it to its condition immediately prior to the explosion. *Tug June S*, 418 F.2d at 307. Marine asserts, however, that the district court did not adhere to this standard because the judgment allowed Stokes to repair parts of the old facility with new materials. Marine does not suggest another available option. Usually repairs are made with new materials. Furthermore, no evidence indicates that the cost of repair exceeded the fair market value of the terminal. Absent a showing that Stokes could have reasonably effected less expensive repairs, we cannot say that

**1258**

the district court erred on the evidence before it.

### Prejudgment Interest

■ Finally, Marine appeals the district court's decision awarding prejudgment interest to Stokes. Stokes expended $10,093.22 for repairs but did not expend any amount with respect to the remaining estimate of $192,438.80. Marine contends that the district court incorrectly awarded Stokes prejudgment interest on the repair costs that Stokes had not yet incurred.

■ In admiralty, a court generally awards prejudgment interest unless it finds extraordinary circumstances that would make the award inequitable. *See Inland Tugs Co. v. Ohio River Co.*, 709 F.2d 1065 (6th Cir.1983). As we stated in *Oglebay Norton Co. v. CSX Corp.*, 788 F.2d 361 (6th Cir.1986):

> [W]here recovery for property damage is sought in an admiralty case, prejudgment interest is usually awarded "as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). In such cases, "[d]iscretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest." *Id.* "Peculiar circumstances" is a broad exception, and it is a factual determination governed by the clearly erroneous standard. *Id.* at 729. If the trial judge does not make a finding of "peculiar circumstances," the appeals court may make such an inference particularly "when the record clearly discloses peculiar circumstances...." *Id.* However, if peculiar circumstances do not exist from the face of the record, the district court can be reversed for failing to award prejudgment interest. In such a case, the court of appeals has the power to modify the award, or remand to the trial judge for a calculation of interest.

788 F.2d at 368 (citations omitted).

■ Courts have denied prejudgment interest to the prevailing party when that party: (1) caused undue delay, (2) claimed damages greater than actual loss and suffered no deprivation of use, or (3) made a bad faith claim. *Alkmeon Naviera, S.A. v. M/V Marina L.*, 633 F.2d 789 (9th Cir. 1980). None of these conditions are present here. Phillips' request for a continuation caused a delay in this trial. Stokes claimed damages no greater than those found by the court and the fire forced Stokes to shut down its terminal operations. Finally, Stokes did not assert a bad faith claim. Marine argues, however, that the fact that Stokes did not actually incur any out-of-pocket expenses for a portion of the estimate is a "peculiar circumstance" that makes an award of prejudgment interest inequitable, since courts usually award prejudgment interest to compensate for loss and not as a penalty. *Stevens v. F/V Bonnie Doon*, 655 F.2d 206, 209 (9th Cir.1981). *Stevens* is distinguishable from this case. There, the court awarded the injured party demurrage and the injured party procured estimates at the time of trial, not at the time of the accident. The trial court denied Stokes demurrage and lost profits. Furthermore, Stokes obtained the repair estimates soon after the accident and the court did not adjust those estimates for inflation. Marine continues to operate, but the terminal explosion forced Stokes to shut down. Although Stokes has not actually expended the entire repair costs, Stokes has suffered for the unrepaired damage to its terminal while Marine has had the use of funds amounting to its portion of the repair costs. Finally, courts do not necessarily require that injured parties expend repair costs before receiving prejudgment interest. *See Independent Bulk Transport v. Vessel Morania Abaco*, 676 F.2d 23, 26 (2d Cir.1982). On this record, we find that failure to make the necessary repairs to reopen the terminal does not present a "peculiar circumstance" such that the court's award of prejudgment interest was inequitable.

AFFIRMED.