## DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, Appellant,

v.

## CALSPAN CORPORATION, Appellee.

### Appeal No. 78–501.

United States Court of Customs and Patent Appeals.

June 8, 1978.

---

Joseph A. Hill, Louise O'Neil, Washington, D.C., attorneys of record, for appellant.

Allen J. Jaffe, Williamsville, N.Y., attorney of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the decision of the Patent and Trademark Office Trademark Trial and Appeal Board ("board")[1] denying appellant's petition[2] to cancel appellee's registration[3] of FINDER as a trademark for electro-optical computer equipment (card movers, scanners, pre-processors, control units, and parts therefor) for sensing, detecting, and locating minute features in fingerprint images. We affirm.

BACKGROUND

FINDER is an acronym derived from FINgerprint DEscription Reader, the name given an automated fingerprint identification system manufactured under a government-sponsored research and development contract entered into on June 19, 1967, between appellant Federal Bureau of Investigation ("FBI") and Cornell Aeronautical Laboratory, Inc. ("CAL") of Buffalo, New York, a corporation duly organized under the laws of the State of New York.

It appears that first use of FINDER to identify the fingerprint reader was by CAL's contract manager in a technical proposal dated February 12, 1971, which was accepted by the FBI as one of numerous modifications of the basic agreement. Subsequent communications between the parties routinely employed FINDER in referring to both the fingerprint reader and the research and development project itself.

The first published document in which the name FINDER appeared was a paper delivered by R. M. Stock, then a section head at CAL, at the Carnahan Conference on Electronic Crime Countermeasures, held April 19–22, 1972.[4] The paper, which was included in the published proceedings of the conference, made reference to "The FINDER automatic fingerprint reader which is under development by Cornell Aeronautical Laboratory, Inc. for the Federal Bureau of Investigation . . . ."

The prototype fingerprint reader was delivered to the FBI in Washington, D.C., on September 7, 1972, with each component having an attached identification plate bearing (1) the name FINDER in upper case, boldface letters directly above the words FINGERPRINT READER in smaller upper case letters, (2) CAL's name, (3) the name of the particular unit, e. g., SCANNER UNIT, and (4) the number of the contract under which the system was developed (J–FBI–6499).

By amendment to its certificate of incorporation on November 17, 1972, CAL changed its name to Calspan Corporation ("Calspan"). The amendment also expanded the scope of the corporation's business activities by providing, *inter alia*:

Second: The purposes for which the corporation is formed are . . . :

(a) To engage in . . . research and development of all kinds, in the physical sciences, mathematics, and other disciplines, for its own account and for others.

.　　.　　.　　.　　.

(c) To commercially utilize the results of any corporate activities including, but not limited to, the foregoing activities, and to otherwise turn those activities to commercial advantage, including, but not limited to, the production, acquisition and disposition, and utilization of property, whether personal or real, tangible or intangible, or any interest therein, the furnishing of goods and services of any kind whatsoever with respect thereto, and the engaging in any activity of any kind whatsoever incidental thereto.[5]

1. Reported at 196 USPQ 326 (1977).

2. No. 10,754, filed November 5, 1974.

3. No. 997,283, issued November 5, 1974.

4. Mr. Stock had obtained FBI approval of the paper before submitting it to the conference review board.

5. The "purposes" set forth in CAL's original certificate of incorporation included:

On October 18, 1973, Calspan filed an application to register FINDER as a trademark, claiming first use in commerce on September 7, 1972, the date of delivery of the prototype reader to the FBI.

On November 5, 1974, the very date that Calspan's application issued as Registration No. 997,283, the FBI filed the petition which is the subject of this action, alleging as grounds for cancellation: (1) "Calspan . . . is not the owner of the mark FINDER . . . as required by . . 15 U.S.C. § 1051, and is not, therefore, entitled to register the term as a trademark"; (2) "[T]he Federal Bureau of Investigation . . . has continuously used . . . FINDER to signify a fingerprint reading device developed for petitioner . . . and . . . to identify its fingerprint reading device . . . long prior to the . . . application for registration . . . by Calspan . . ."; (3) "Through general useage [sic] . . . FINDER has been widely used and known throughout the law enforcement community of the United States as the fingerprint reading machine developed by the Federal Bureau of Investigation"; and (4) "The presumptions arising from registration of . . FINDER to Calspan . . . are inconsistent with petitioner's prior, continuous and *exclusive right to use* . . . FINDER to identify its fingerprint reading device, its . . . operations and its services." [Emphasis added.]

## Proceedings Below

Apparently influenced by the FBI's claim of an exclusive right to use the name FINDER, the board, after a detailed review of the facts and the contentions of the parties, characterized the FBI's position as follows:

Petitioner, while contending that both it and respondent have used the term "FINDER" in a descriptive manner, nevertheless is claiming a proprietary right in such term on the basis that through general usage the name "FINDER" has been widely used and known throughout the law enforcement community of the United States as the fingerprint reading machine developed by the F.B.I.

Consistent with this view and with its surprising generalization that "the petitioner in a cancellation proceeding bears a much heavier burden of proof than the opposer in an opposition proceeding,"[6] the board framed the issue as "whether petitioner has adequately met this heavy burden of proof and overcome the prima facie validity of respondent's registration and respondent's right of ownership and right to use the mark 'FINDER'." In short, the board looked upon the controversy as one involving ownership of the mark. It resolved the issue adversely to the FBI, rejecting in the process the argument that Calspan had failed to make a valid trademark use of FINDER.

## Issues

The dispositive issues presented by this appeal are: (1) whether FINDER is the common descriptive name of the goods described in Calspan's registration; (2) whether CAL satisfied the "used in commerce" requirement of 15 U.S.C. § 1051; (3) whether Calspan is the owner of the mark; and (4) whether the board's error in assessing the degree of burden of proof to be met by the FBI in this proceeding was harmless.

## OPINION

### Common Descriptive Name

Notwithstanding the FBI's arguments to the contrary, the mere fact that the parties to the research and development

---

To . . . sell, assign and dispose of inventions, applications for patents, patent rights, and/or formulae, both foreign and domestic, and interests therein . . . . .

**6.** As authority for this proposition, the board cited *W. D. Byron & Sons, Inc. v. Stern Bros. Mfg. Co.*, 377 F.2d 1001, 54 CCPA 1442, 153

USPQ 749 (1967), and *Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399, 181 USPQ 272 (Cust. & Pat.App. 1974). Obviously the board misread our opinion in *Massey* as reaffirming *Byron & Sons* on this point.

contract, as well as others, used FINDER to identify the fingerprint reader prior to Calspan's application for trademark registration does not warrant cancellation on the ground that FINDER is the fingerprint reader's common descriptive name. Our focus must be on the public's understanding of FINDER in determining whether it is the common descriptive name of the fingerprint reader. 1 J. Gilson, *Trademark Protection and Practice,* § 2.02[1] at 2–13 (1977). The relevant evidence, therefore, is not the communications between CAL and the FBI relative to performance of the contract which the latter has made of record, but the instances of public use of the name FINDER by the FBI, CAL, Calspan, or others. The record shows that virtually every public use of FINDER has identified CAL or Calspan as the source of the fingerprint reader.[7] Moreover, in each instance FINDER has appeared entirely in upper case and has often had quotation marks around it. Therefore, on this record, we cannot agree that FINDER is the common descriptive name of the goods described in Calspan's registration.

*Use in Commerce*

■ Invoking the aphorism that one claiming trademark rights must be engaged in a trade, the FBI argues that CAL acquired no trademark rights in the name FINDER because it lacked an established production line in fingerprint readers and cannot rely on its single delivery in interstate commerce as a basis for registration of the mark.

The record clearly shows that CAL was engaged in the development and manufacture of a *prototype* fingerprint reader, which, by definition,[8] rules out the existence of an established production line. Also, the fact that Calspan has made only a single sale of the fingerprint reader is not at all surprising, considering its enormous expense[9] and the limited demand for such equipment. In any event, the nonoccurrence of additional sales certainly cannot be attributed to a lack of effort on CAL's part in attempting to generate interest in the fingerprint reader among potential purchasers. The board found as follows:

> The record further substantiates respondent's claim of trademark rights in the term "FINDER" by the fact that prior to and subsequent to the delivery of the fingerprint reader to the F.B.I., CAL was extremely active in informing numerous law enforcement agencies and other interested groups, and in publishing the fact that it had developed a fingerprint reader for the F.B.I., and referred to such reader as "FINDER".

The FBI has not questioned this finding. Nor has it questioned that FINDER was affixed to the fingerprint reader that was shipped in interstate commerce from Buffalo, New York, to Washington, D. C.[10] Under such circumstances, we regard as controlling the principle set forth in *Community of Roquefort v. Santo,* 443 F.2d 1196, 58 CCPA 1303, 170 USPQ 205 (1971), that the fact of limited sales (made even for registration purposes), coupled with intent to continue use of the mark, is a sufficient basis for federal registration.

7. Typical of the public use made by the FBI is the following excerpt from a press release issued on October 3, 1972, by the Acting Director of the FBI: "The equipment, called 'FINDER,' was designed, developed and built by Cornell Aeronautical Laboratory, Inc. . . . at a cost of about $1.25 million."

Such use is not only inconsistent with the argument that FINDER is the common descriptive name of the goods, but also contradicts the assertion that the public associates the name FINDER with the FBI rather than the manufacturer.

8. *Webster's Third New International Dictionary* (1961) gives the following definition:

*prototype . . . 1a(1):* an original on which a thing is modeled: PATTERN . . ..

9. According to the testimony of Dr. H. R. Leland, Calspan's vice president for commercial development, the cost of a fingerprint reader in 1975 was approximately $800,000 to $1,000,000.

10. All that is statutorily required for use in commerce under 15 U.S.C. § 1127 is that the mark be "placed in any manner on the goods . . . and the goods [be] sold or transported in commerce . . . .."

## Calspan's Ownership of the Mark

■ Recurring throughout the FBI's arguments is the notion that CAL and Calspan are distinct legal entities, the inference being that whatever trademark use CAL may have made of the name FINDER, such use did not enure to Calspan's benefit; further, that there was no formal assignment of the mark from CAL to Calspan. The board correctly disposed of this point as follows:

> Section 801 of the laws of the State of New York states that a corporation may amend its certificate of incorporation so as (1) to change its corporate name and (2) to enlarge, limit or otherwise change its corporate purposes. Calspan, the respondent, therefore remained the same legal entity as Cornell Aeronautical Laboratory, Inc., and the amendment to the original certificate of incorporation effected by CAL on November 17, 1972, was of no consequence as far as the issues in the present proceeding before this Board are concerned.[11]

Thus, there was no need for any formal transfer of trademark rights from CAL to Calspan. Under New York law, they constituted a single continuous corporate entity. Also, we note that the record shows that the corporate name change occurred prior to the application for trademark registration. Hence, Calspan properly identified itself in the application as the owner of the mark.

11. N.Y.Bus.Corp.Law § 801 (McKinney 1963), in pertinent part, provides:

(a) A corporation may amend its certificate of incorporation . . . in any and as many respects as may be desired, if such amendment contains only such provisions as might be lawfully contained in an original certificate of incorporation filed at the time of making such amendment.

(b) In particular, and without limitation upon such general power of amendment, a corporation may amend its certificate of incorporation . . . so as:

(1) To change its corporate name.

## Burden of Proof

■ Although the board acknowledged the FBI's reliance in its cancellation petition on use of the name FINDER in a descriptive manner, its denial of the petition was clearly based on the FBI's failure to establish ownership of the mark. In its brief before this court, the FBI denies any claim of a proprietary right in the name FINDER and maintains that misinterpretation of its position concerning ownership of the mark led to the board's error "in assessing the degree of burden of proof required by appellant in this proceeding."

As earlier noted, the board misread our opinion in *Massey Junior College, Inc. v. Fashion Institute of Technology, supra,* where we said, 492 F.2d at 1404, 181 USPQ at 275:

> [T]he legislative purpose [of the Lanham Act] is not to be achieved through some general rule such as that stated in the *Byron & Sons* case, supra, regarding the *degree* of proof depending on whether there is an opposition or cancellation proceeding; or by following a standard of "due caution" and "most careful study," which should characterize the approach to any case. Rather, consideration of all the facts and circumstances in each case is what is required. [Footnote omitted.]

Although such misreading by the board was error, we are satisfied that the error was harmless, since, for reasons already discussed, the FBI has failed to demonstrate that Calspan's registration is subject to cancellation on the grounds set forth in the petition to cancel.[12] Here, as in every can-

(2) To enlarge, limit or otherwise change its corporate purpose. . . .

12. *Scanwell Laboratories, Inc. v. Department of Transp.,* 484 F.2d 1385, 179 USPQ 238 (Cust. & Pat.App.1973), relied upon by the FBI, is distinguishable from the present case. In that cancellation proceeding, the record supported the conclusion that, as used, Scanwell's alleged trademark, "V-Ring," was descriptive of antenna elements and that Scanwell acquiesced in the FAA's use of the mark in the same way. The evidence showed that a 1964 FAA memorandum made available to the public did not identify Scanwell as the manufacturer of the "V-Ring" antenna system developed for the

cellation proceeding, the burden is on the petitioner to show by a preponderance of the evidence that it is or will be damaged by continued registration of the mark. We are not persuaded that the FBI has made such a showing.

In view of the foregoing, the board's denial of the petition to cancel is *affirmed.*

*AFFIRMED.*

FAA under contract. Although aware of such use by the FAA, Scanwell took no action until 1969. Additionally, it was considered likely that "V-Ring" would be regarded as a term distinguishing one antenna array from others by type rather than by origin.