**ZAZÚ DESIGNS, a partnership, Plaintiff–Appellee,**

**v.**

**L'ORÉAL, S.A., Defendant–Appellant.**

**No. 91–2842.**

United States Court of Appeals, Seventh Circuit.

Argued May 1, 1992.

Decided Nov. 2, 1992.

As Amended Nov. 6, 1992.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 28, 1992.

James T. Fitzgibbon (argued), Angelo J. Bufalino, C. Michael Kendall, Lockwood, Alex, Fitzgibbon & Cummings, Chicago, Ill., for plaintiff-appellee.

Thomas P. Sullivan (argued), Thomas F. Cotter, Jenner & Block, Richard A. Schnurr, Owen J. Murray, Marshall, O'Toole, Gerstein, Murray & Bicknell, Chicago, Ill., Russell H. Falconer, Brendan J. O'Rourke, Doreen Leavens, Parker H. Bagley, Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant-appellant.

Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

In 1985 Cosmair, Inc., concluded that young women craved pink and blue hair. To meet the anticipated demand, Cosmair developed a line of "hair cosmetics"—hair coloring that is easily washed out. These inexpensive products, under the name ZAZU, were sold in the cosmetic sections of mass merchandise stores. Apparently the teenagers of the late 1980s had better taste than Cosmair's marketing staff thought. The product flopped, but its name gave rise to this trademark suit. Cosmair is the United States licensee of L'Oréal, S.A., a French firm specializing in perfumes, beauty aids, and related products. Cosmair placed L'Oréal's marks on the bottles and ads. For reasons the parties have not explained, L'Oréal rather than Cosmair is the defendant even though the events that led to the litigation were orchestrated in New York rather than Paris. L'Oréal does not protest, so for simplicity we refer to Cosmair and L'Oréal collectively as "L'Oréal."

L'Oréal hired Wordmark, a consulting firm, to help it find a name for the new line of hair cosmetics. After checking the United States Trademark Register for conflicts, Wordmark suggested 250 names. L'Oréal narrowed this field to three, including ZAZU, and investigated their availability. This investigation turned up one federal registration of ZAZU as a mark for clothing and two state service mark registrations including that word. One of these is Zazú Hair Designs; the other was defunct.

Zazú Hair Designs is a hair salon in Hinsdale, Illinois, a suburb of Chicago. We call it "ZHD" to avoid confusion with the ZAZÚ mark. (ZHD employs an acute accent and L'Oréal did not; no one makes anything of the difference.) The salon is a partnership between Raymond R. Koubek and Salvatore J. Segretto, hairstylists who joined forces in 1979. ZHD registered ZAZÚ with Illinois in 1980 as a trade name for its salon. L'Oréal called the salon to find out if ZHD was selling its own products. The employee who answered reported that the salon was not but added, "we're working on it". L'Oréal called again; this time it was told that ZHD had no products available under the name ZAZÚ.

L'Oréal took the sole federal registration, held by Riviera Slacks, Inc., as a serious obstacle. Some apparel makers have migrated to cosmetics, and if Riviera were about to follow Ralph Lauren (which makes perfumes in addition to shirts and skirts) it might have a legitimate complaint against a competing use of the mark. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 24 U.S.P.Q.2d 1001, 1011 (7th Cir.1992). Riviera charged L'Oréal $125,000 for a covenant not to sue if L'Oréal used the ZAZU mark on cosmetics. In April 1986, covenant in hand and satisfied that ZHD's state trade name did not prevent the introduction of a national product, L'Oréal made a small interstate shipment of hair cosmetics under the ZAZU name. It used this shipment as the basis of an application for federal registration, filed on June 12, 1986. By August L'Oréal had advertised and sold its products nationally.

Unknown to L'Oréal, Koubek and Segretto had for some time aspired to emulate Vidal Sassoon by marketing shampoos and

conditioners under their salon's trade name. In 1985 Koubek began meeting with chemists to develop ZHD's products. Early efforts were unsuccessful; no one offered a product that satisfied ZHD. Eventually ZHD received acceptable samples from Gift Cosmetics, some of which Segretto sold to customers of the salon in plain bottles to which he taped the salon's business card. Between November 1985 and February 1986 ZHD made a few other sales. Koubek shipped two bottles to a friend in Texas, who paid $13. He also made two shipments to a hair stylist friend in Florida—40 bottles of shampoo for $78.58. These were designed to interest the Floridian in the future marketing of the product line. These bottles could not have been sold to the public, because they lacked labels listing the ingredients and weight. See 21 U.S.C. § 362(b); 15 U.S.C. §§ 1452, 1453(a); 21 C.F.R. §§ 701.3, 701.13(a). After L'Oréal's national marketing was under way, its representatives thrice visited ZHD and found that the salon still had no products for sale under the ZAZÚ name. Which is not to say that ZHD was supine. Late in 1985 ZHD had ordered 25,000 bottles silkscreened with the name ZAZÚ. Later it ordered stick-on labels listing the ingredients of its products. In September 1986 ZHD began to sell small quantities of shampoo in bottles filled (and labeled) by hand in the salon. After the turn of the year ZHD directed the supplier of the shampoo and conditioner to fill some bottles; the record does not reveal how many.

After a bench trial the district court held that ZHD's sales gave it an exclusive right to use the ZAZÚ name nationally for hair products. 9 U.S.P.Q.2d 1972 (N.D.Ill.1988). The court enjoined L'Oréal from using the mark (a gesture, since the product had bombed and L'Oréal disclaimed any interest in using ZAZU again). It also awarded ZHD $100,000 in damages on account of lost profits and $1 million more to pay for corrective advertising to restore luster to the ZAZÚ mark. Finding that L'Oréal had infringed ZHD's mark intentionally and used

"oppressive and deceitful" tactics in the litigation, the court awarded an additional $1 million in punitive damages, topped off with $76,000 to cover ZHD's legal expenses. (L'Oréal has changed law firms for the appeal; its current counsel did not participate in the events that the district judge found to be unethical.)

■ Between the filing of the opinion and the entry of judgment, L'Oréal made a motion under Fed.R.Civ.P. 52(b) for an additional hearing. It wanted to present evidence that it believed would show the judge that he misunderstood the actions and motives of its lawyers. The court denied this motion without comment and entered judgment. Not dissuaded, L'Oréal served an all-but-identical motion within ten days of the judgment. Two years later the court granted this motion. After taking additional evidence the court modified some of its findings, but not its judgment. 1991 WL 128694, 1991 U.S.Dist. LEXIS 9433. ZHD won an additional $92,000 in legal fees to compensate for the cost of the new hearing. L'Oréal at last appealed, and the parties have ignored a potential problem: a second post-trial motion does not extend the time for appeal. *Charles v. Daley*, 799 F.2d 343 (7th Cir.1986). But because only one of these motions was filed after the judgment, it suspended the judgment's finality and makes the appeal timely, even though the denial of the first motion shows that the duplicate was unlikely to succeed. *United States v. Ibarra*, —— U.S. ——, 112 S.Ct. 4, 116 L.Ed.2d 1 (1991).

## I

Federal law permits the registration of trademarks and the enforcement of registered marks. Through § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a provision addressed to deceit, it also indirectly allows the enforcement of unregistered marks. But until 1988 federal law did not specify how one acquired the rights that could be registered or enforced without registration.[†] That subject fell into the domain of

---

† The Trademark Law Revision Act of 1988 added provisions allowing for registration of a mark

on a showing that the applicant has a "bona fide intention ... to use a trademark in commerce".

state law, plus federal common law elaborating on the word "use" in § 43(a). *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992); *id.* —— U.S. at ——, 112 S.Ct. at 2766–67 (Thomas, J., concurring). See also 15 U.S.C. § 1127 (" 'trademark' includes any word ... used by a person"). At common law, "use" meant sales to the public of a product with the mark attached. *Trade–Mark Cases*, 100 U.S. 82, 94–95, 25 L.Ed. 550 (1879); *Menendez v. Holt*, 128 U.S. 514, 520–21, 9 S.Ct. 143, 143–44, 32 L.Ed. 526 (1888). See also *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 414, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918).

■ "Use" is neither a glitch in the Lanham Act nor a historical relic. By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly. Public sales let others know that they should not invest resources to develop a mark similar to one already used in the trade. *Blue Bell, Inc. v. Farah Manufacturing Co.*, 508 F.2d 1260, 1264–65 (5th Cir.1975); see also William M. Landes and Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & Econ. 265, 281–84 (1987). Only active use allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated.

■ Under the common law, one must win the race to the marketplace to establish the exclusive right to a mark. *Blue Bell v. Farah; La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271–74 (2d Cir.1974). Registration modifies this system slightly, allowing slight sales plus notice in the register to substitute for substantial sales without notice. 15 U.S.C. § 1051(a). (The legislation

in 1988 modifies the use requirement further, but we disregard this.) ZHD's sales of its product are insufficient use to establish priority over L'Oréal. A few bottles sold over the counter in Hinsdale, and a few more mailed to friends in Texas and Florida, neither link the ZAZÚ mark with ZHD's product in the minds of consumers nor put other producers on notice. As a practical matter ZHD had no product, period, until months after L'Oréal had embarked on its doomed campaign.

■ In finding that ZHD's few sales secured rights against the world, the district court relied on cases such as *Department of Justice v. Calspan Corp.*, 578 F.2d 295 (C.C.P.A.1978), which hold that a single sale, combined with proof of intent to go on selling, permit the vendor to register the mark. See also *Axton–Fisher Tobacco Co. v. Fortune Tobacco Co.*, 82 F.2d 295 (C.C.P.A.1936); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir.1956); *Community of Roquefort v. Santo*, 443 F.2d 1196 (C.C.P.A.1971). But use sufficient to register a mark that soon is widely distributed is not necessarily enough to acquire rights in the absence of registration. The Lanham Act allows only trademarks "used in commerce" to be registered. 15 U.S.C. § 1051(a). Courts have read "used" in a way that allows firms to seek protection for a mark before investing substantial sums in promotion. See *Fort Howard Paper Co. v. Kimberly–Clark Corp.*, 390 F.2d 1015 (C.C.P.A.1968); cf. *Jim Dandy Co. v. Martha White Foods, Inc.*, 458 F.2d 1397, 1399 (C.C.P.A.1972) (party may rely on advertising to show superior registration rights); but see *Weight Watchers International, Inc. v. I. Rokeach & Sons, Inc.*, 211 U.S.P.Q. 700, 709 (T.M.T.A.B.1981) (more than minimal use is required to register because the statute allows only "owner[s]" to register, and ownership of a mark depends on commer-

15 U.S.C. § 1051(b). Filing such an "intent-to-use" application establishes priority as of the date of filing (except as against those already using the mark), but a statement of actual use must be filed within 6 months, which may be extended to 24. 15 U.S.C. § 1051(d). At the

same time the statute was revised to provide that " 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

cial use). Liberality in registering marks is not problematic, because the registration gives notice to latecomers, which token use alone does not. Firms need only search the register before embarking on development. Had ZHD registered ZAZÚ, the parties could have negotiated before L'Oréal committed large sums to marketing.

 ZHD applied for registration of ZAZÚ after L'Oréal not only had applied to register the mark but also had put its product on the market nationwide. Efforts to register came too late. At oral argument ZHD suggested that L'Oréal's knowledge of ZHD's plan to enter the hair care market using ZAZÚ establishes ZHD's superior right to the name. Such an argument is unavailing. Intent to use a mark, like a naked registration, establishes no rights at all. *Hydro–Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1472 (Fed.Cir.1987). Even under the 1988 amendments (see note †), which allow registration in advance of contemplated use, an unregistered *plan* to use a mark creates no rights. Just as an intent to buy a choice parcel of land does not prevent a rival from closing the deal first, so an intent to use a mark creates no rights a competitor is bound to respect. A statute granting no rights in bare registrations cannot plausibly be understood to grant rights in "intents" divorced from either sales or registrations. Registration itself establishes only a rebuttable presumption of use as of the filing date. *Rolley, Inc. v. Younghusband*, 204 F.2d 209, 211 (9th Cir.1953). ZHD made first use of ZAZÚ in connection with hair *services* in Illinois, but this does not translate to a protectable right to market hair *products* nationally. The district court construed L'Oréal's knowledge of ZHD's use of ZAZÚ for salon services as knowledge "of [ZHD'S] superior rights in the mark." 9 U.S.P.Q.2d at 1978. ZHD did not, however, have superior rights in the mark as applied to hair products, because it neither marketed such nor registered the mark before L'Oréal's use. Because the mark was not registered for use in conjunction with hair products, any knowledge L'Oréal may have had of ZHD's plans is irrelevant. Cf. *Weiner King,*

*Inc. v. Wiener King Corp.*, 615 F.2d 512 (C.C.P.A.1980).

Imagine the consequences of ZHD's approach. Businesses that knew of an intended use would not be entitled to the mark even if they made the first significant use of it. Businesses with their heads in the sand, however, could stand on the actual date they introduced their products, and so would have priority over firms that intended to use a mark but had not done so. Ignorance would be rewarded—and knowledgeable firms might back off even though the rivals' "plans" or "intent" were unlikely to come to fruition. Yet investigations of the sort L'Oréal undertook prevent costly duplication in the development of trademarks and protect consumers from the confusion resulting from two products being sold under the same mark. See *Natural Footwear Ltd. v. Hart, Shaffner & Marx,* 760 F.2d 1383, 1395 (3d Cir.1985). L'Oréal should not be worse off because it made inquiries and found that, although no one had yet used the mark for hair products, ZHD intended to do so. Nor should a potential user have to bide its time until it learns whether other firms are serious about marketing a product. The use requirement rewards those who act quickly in getting new products in the hands of consumers. Had L'Oréal discovered that ZHD had a product on the market under the ZAZÚ mark or that ZHD had registered ZAZÚ for hair products, L'Oréal could have chosen another mark before committing extensive marketing resources. Knowledge that ZHD planned to use the ZAZÚ mark in the future does not present an obstacle to L'Oréal's adopting it today. *Selfway, Inc. v. Travelers Petroleum, Inc.*, 579 F.2d 75, 79 (C.C.P.A.1978).

Occasionally courts suggest that "bad faith" adoption of a mark defeats a claim to priority. See *California Cedar Products Co. v. Pine Mountain Corp.*, 724 F.2d 827, 830 (9th Cir.1984); *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 857 (2d Cir.1982); *Blue Bell v. Farah*, 508 F.2d at 1267. Although ZHD equates L'Oréal's knowledge of its impending use with "bad faith," the cases use the term differently. In each instance the court applied the label

"bad faith" to transactions designed merely to reserve a mark, not to link the name to a product ready to be sold to the public. In *California Cedar Products*, for example, two firms sprinted to acquire the abandoned DURAFLAME mark. One shipped some of its goods in the abandoning company's wrapper with a new name pasted over it. Two days later the other commenced bona fide sales under the DURAFLAME mark. The court disregarded the first shipment, calling it "both premature and in bad faith", 724 F.2d at 830, and held that the first firm to make bona fide sales to customers was the prior user. "Bad faith" was no more than an epithet stapled to the basic conclusion: that reserving a mark is forbidden, so that the first producer to make genuine sales gets the rights. If these cases find a parallel in our dispute, ZHD occupies the place of the firm trying to reserve a mark for "intended" exploitation. ZHD doled out a few samples in bottles lacking labeling necessary for sale to the public. Such transactions are the sort of pre-marketing maneuvers that these cases hold insufficient to establish rights in a trademark.

■ The district court erred in equating a use sufficient to support registration with a use sufficient to generate nationwide rights in the absence of registration. Although whether ZHD's use is sufficient to grant it rights in the ZAZÚ mark is a question of fact on which appellate review is deferential, *California Cedar Products*, 724 F.2d at 830; cf. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428–29 (7th Cir.1985), the extent to which ZHD used the mark is not disputed. ZHD's sales of hair care products were insufficient as a matter of law to establish national trademark rights at the time L'Oréal put its electric hair colors on the market.

## II

A second, and independently sufficient, error requires us to set aside the judgment. ZHD did not establish that L'Oréal's sales injured it in the slightest, let alone that it is entitled to $2.1 million plus hefty attorneys' fees.

■ The district court awarded ZHD $100,000 as compensation for lost profits. Because ZHD did not have any track record of sales preceding L'Oréal's campaign, the district judge assumed that ZHD would sell shampoo or conditioner in all of the 25,000 bottles. Yet ownership of bottles hardly establishes that ZHD could sell a single quart of shampoo, let alone that it would make a profit of $4 per bottle. ZHD ordered 25,000 bottles not because it had any prospect of selling them but because the vendor offered a quantity discount. ZHD did not present evidence showing that other salons that have tried to sell hair products nationally made profits approximating $100,000. As far as the record reveals, ZHD approached only four other salons about selling its product. What these salons could have sold is unknown. ZHD's salon sold about $12,000 of other firms' products per year; nothing in the record enables us to tell the extent to which these sales would have been displaced by products with a ZAZÚ mark, or how much more profit per bottle ZHD would have made selling its own shampoo rather than Vidal Sassoon's. In the years since L'Oréal cried uncle, ZHD has done nothing to enter the market, using ZAZÚ or any other mark. The 25,000 bottles are in storage, most of them empty. If there are indeed profits to be made, ZHD has been singularly lax in reaping them.

Nothing but conjecture supports a conclusion that ZHD could have made $4 per bottle on 25,000 bottles. The district court brushed aside the lack of proof on the rationale that "the speculation which is inherent in the award of damages to plaintiff was knowingly and intentionally brought upon defendant by itself." 9 U.S.P.Q.2d at 1979. Although uncertainty created by wrongful acts does not insulate the wrongdoer from liability, "people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir.1992). See *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Sands, Taylor & Wood*

*Co.,* 24 U.S.P.Q.2d at 1013–14; *FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 624 (7th Cir.1989); *Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers,* 798 F.2d 1016, 1021–23 (7th Cir.1986). Compensatory damages must rest on "a just and reasonable estimate of the damage based on relevant data". *Bigelow,* 327 U.S. at 264, 66 S.Ct. at 580. Allowance for uncertainty is one thing, see *Grove Fresh Distributors, Inc. v. New England Apple Products Co.,* 969 F.2d 552 (7th Cir.1992), and rank speculation another. ZHD offered no evidence to allow a reasonable estimate that it would have made $100,000 from its nascent products had L'Oréal not sold zany hair colors under the ZAZU mark.

■ The district court added $1 million to the $100,000, for a total compensatory award of $1.1 million, on the theory that ZHD needed to counteract the effect of L'Oréal's promotional campaign. Although the court called this an award "for corrective advertising," the judgment allows ZHD to do as it pleases with the million; it need not run a single ad. The court arrived at $1 million by taking 20% of the $5 million L'Oréal had spent advertising ZAZU hair coloring. The court's only explanation was that "[t]he evidence shows that defendant injured the mark. In these circumstances, plaintiff is entitled to try to resurrect it." 1991 WL 128694 at *2, 1991 U.S.Dist. LEXIS 9433 at *4–*5.

Like the $100,000, the $1 million is an arbitrary number; an award of $6⅞ would be neither more nor less supportable. Using a percentage of some number unrelated to the plaintiff's injury is an unacceptable way to estimate damages, a point we recently made in another trademark case. *Sands, Taylor & Wood Co.,* 24 U.S.P.Q.2d at 1014.

■ Any compensatory award depends on loss, and in treating the need for advertising as a "loss" the court overlooked the principle that a trademark cannot be worth less than zero. "Corrective advertising" is a method of repair. Defendant diminishes the value of plaintiff's trademark, and advertising restores that mark to its original value. E.g., *Big O*

*Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1374–76 (10th Cir.1977); Comment, *Money Damages and Corrective Advertising: An Economic Analysis,* 55 U.Chi.L.Rev. 629 (1988). Expenses for repair cannot be justified when they exceed the value of the asset. If a car worth $4,000 is crushed in a collision and repair would cost $10,000, the court awards damages of $4,000, not $10,000 (or, as seems to have happened in our case, $14,-000).

■ To justify damages to pay for corrective advertising a plaintiff must show that the confusion caused by the defendant's mark injured the plaintiff and that "repair" of the old trademark, rather than adoption of a new one, is the least expensive way to proceed. ZHD established neither element. Although both ZHD and the district court refer to L'Oréal's product as "garish," ZHD did not offer any evidence that consumers (even those who found orange hair revolting) would be less willing to use shampoo tastefully marketed under the same name. Indeed, ZHD did not offer evidence that a single consumer remembered L'Oréal's products by the time of trial. If as the district court found L'Oréal "injured the mark to such an extent that it may never be useful to plaintiff in conjunction with the merchandising of plaintiff's hair care products", 9 U.S.P.Q.2d at 1979, the appropriate course is to forget about ZAZÚ and award damages fully compensating for the mark's value at the time L'Oréal pounced. See *Coursey v. Broadhurst,* 888 F.2d 338, 344 (5th Cir.1989); *Phillips Petroleum Co. v. Stokes Oil Co., Inc.,* 863 F.2d 1250, 1257 (6th Cir.1988). Choosing another name under which to market its product will cost ZHD less than $1 million—ZHD spent far less than this on the imprinted bottles, never advertised its product, and did not come within an order of magnitude of this sum in promoting the salon throughout its existence. ZHD made no claim that the salon had suffered as a result of L'Oréal's use of ZAZU, and few people were aware of ZHD's plans to market hair products under the ZAZÚ name. A new name thus can be chosen at a low cost.

ZHD has made no corrective advertising expenditures—suggesting either that L'Oréal's use of ZAZU did not injure ZHD or that it is cheaper for ZHD to use a new name than to correct the confusion caused by L'Oréal's use.

The final $1 million of the award was explicitly punitive. The district court found that L'Oréal had wilfully infringed ZHD's mark and that "its conduct before and during the litigation ha[d] been oppressive and deceitful." 9 U.S.P.Q.2d at 1979. Believing at the time that L'Oréal's net worth was $20 million, the court opined that an award of 5% of this sum was necessary to deter such conduct in the future. Punitive damages are problematic because the Lanham Act, although providing for the trebling of compensatory damages, forbids other penalties. 15 U.S.C. § 1117(a); *Getty Petroleum Corp. v. Barto Petroleum Corp.*, 858 F.2d 103 (2d Cir.1988); cf. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). The district court found a punitive award authorized by the law of Illinois without explaining where one finds such authorization. The parties have been of no greater assistance. Because some old cases say that Illinois law supports punitive awards in trademark cases, *Aladdin Mfg. Co. v. Mantle Lamp Co.*, 116 F.2d 708, 716–17 (7th Cir.1941); *Keller Products, Inc. v. Rubber Linings Corp.*, 213 F.2d 382, 387 (7th Cir.1954), and L'Oréal has not asked us to revisit the subject, we press forward.

 In stating that L'Oréal's conduct was wilful, the district judge seems to have equated this term with knowing or intentional. Wilful is a word with many uses in the law, but even the weaker connotations imply knowledge of unlawfulness or reckless indifference to the law, and not simply intentional acts. E.g., *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *TWA v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). L'Oréal found out that ZHD was using ZAZU as a service mark, not that ZHD had protected rights in ZAZÚ as a mark for hair care products. The district court did not conclude that L'Oréal actually knew that its use of ZAZU infringed, or didn't care; L'Oréal's whole course of investigation suggests the opposite.

Bad conduct during the litigation is a more secure footing for a penalty. Counsel told the judge that L'Oréal sold a substantial volume of ZAZU hair cosmetics in northern Illinois, leading the court to set an injunction bond too high for ZHD to post. Later the judge learned that these were wholesale sales; local retail sales, which the judge wanted to use as the measure of the bond for an injunction keeping ZAZU hair cosmetics out of ZHD's home territory, were much smaller. The judge accused counsel of deceit. Although counsel protest, saying that they were misunderstood (and that they told the judge, when asked unexpectedly about sales, that they had only wholesale numbers), we accept the district judge's finding. Counsel committed a clearer misrepresentation about L'Oréal's net worth, which ZHD sought in order to make a pitch for hefty punitive damages. L'Oréal's lawyers opposed the request for information, representing that under French law the firm, as a privately held business, had a right to keep such matters secret. The district judge then used $20 million as a rough-and-ready estimate. Later the court learned that L'Oréal is a publicly traded firm, whose glossy annual report ballyhoos a net worth exceeding $1 billion. Counsel did not bother to ascertain the status of their client and regaled the judge with a fable. The court also concluded that L'Oréal's attorneys made false statements to the Trademark Office and unethically tried to negotiate directly with ZHD's partners rather than communicating through its lawyer.

 Contempt of court, Fed.R.Civ.P. 11, and 28 U.S.C. § 1927 provide the principal vehicles for penalizing misconduct in litigation, and before imposing sanctions a judge ought to ask and answer the questions these bodies of law pose. Still, calling the penalty "punitive damages" is inconsequential given *Chambers v. NASCO, Inc.*, —— U.S. ——, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), which holds that judges

**508**

may impose sanctions without express authority in statute or rule. See also *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). Is $1 million the right penalty for counsel's acts? A judge sanctioning misconduct may not draw a number from the Æther but must explain the choice by reference to its role in compensating the wronged party or deterring conduct that injures the judicial system. *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1334 (7th Cir.1992); cf. *Frantz v. United States Powerlifting Federation*, 836 F.2d 1063, 1066 (7th Cir. 1987). After *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), courts should be especially careful to justify the level of punitive awards.

■ One million dollars cannot be justified as necessary to either compensation or deterrence. The judge discussed neither. Instead he calculated the award as a percentage of L'Oréal's (supposed) net worth—as if having a large net worth were the wrong to be deterred! Punitive damages are appropriate when some wrongful conduct evades detection; a multiplier then both compensates and deters. Punitive awards also are appropriate when the conduct in question is wholly antisocial, for then excessive awards cannot deter borderline conduct that may be beneficial. *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 623 (7th Cir.1989). Some trademark infringements are concealed; for example, passing off a lower quality product under a copy of another's mark. L'Oréal's conduct, however, was not of this type. L'Oréal did not try to palm off its product as ZHD's, and there was little chance that L'Oréal's national advertisements and sales would escape notice. L'Oréal's use was not only easily detected but also in the class of potentially beneficial uses that could be discouraged by excessive awards. So, too, its conduct of the litigation was well known to ZHD. Employing L'Oréal's net worth as the starting point did not help the court identify concealable offenses and may have misled it about the appropriate size of the award.

Courts take account of a defendant's wealth when "[a]n amount sufficient to punish or to deter one individual may be trivial to another." *Black v. Iovino*, 219 Ill.App.3d 378, 394, 162 Ill.Dec. 513, 524, 580 N.E.2d 139, 150 (1st Dist.1991). See also *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir.1985). For natural persons the marginal utility of money decreases as wealth increases, so that higher fines may be needed to deter those possessing great wealth. ("May be" is an important qualifier; the entire penalty includes extra-judicial consequences, such as loss of business and other future income, that is likely to be greater for wealthier defendants.) Corporations, however, are not wealthy in the sense that persons are. Corporations are abstractions; investors own the net worth of the business. These investors pay any punitive awards (the value of their shares decreases), and they may be of average wealth. Pension trusts and mutual funds, aggregating the investments of millions of average persons, own the bulk of many large corporations. Seeing the corporation as wealthy is an illusion, which like other mirages frequently leads people astray.

Corporate assets finance ongoing operations and are unrelated to either the injury done to the victim or the size of the award needed to cause corporate managers to obey the law. Net worth is a measure of profits that have not yet been distributed to the investors. Why should damages increase because the firm reinvested its earnings? Absolute size, like net worth, also is a questionable reason to extract more per case. If L'Oréal introduces 10,000 products, perhaps 10 of these infringe someone else's trademark. Awards of ordinary damages in all 10 cases deter wrongful conduct. The net judgment bill of the firm will increase with its wrongs, without the need for punitive damages. If a larger firm is more likely to commit a wrong on any given transaction, then its total damages will increase more than proportionally to its size without augmentation in any given case; if a larger firm is equally or less likely to commit a tort per transaction, then the court ought to praise the manag-

ers rather than multiply the firm's penalty. Consider: General Motors is much larger than Chrysler, and so makes more defective cars, but the goals of compensation and deterrence are achieved for both firms by awarding as damages the injury produced per defective car. Corporate size is a reason to magnify damages only when the wrongs of larger firms are less likely to be punished; yet judges rarely have any reason to suppose this, and the court in this case had none.

None of the awards—not the $100,000 for lost profits, not the $1 million for corrective advertising, and not the $1 million in punitive damages—rests on an adequate foundation. Given our conclusion in Part I, L'Oréal prevails on the merits and ZHD is not entitled to damages of any size, or to attorneys' fees under the Lanham Act. The case is remanded so that the district court may consider whether a sanction is appropriate for L'Oréal's misconduct during the litigation.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, dissenting.

On the important issue of good faith, L'Oréal's conduct here merits a very hard look. In the case of Riviera, a *men's* clothing retailer, L'Oréal was careful to pay $125,000 for an agreement not to sue. Yet men's clothing and hair cosmetics marketed to women hardly seem related at all. On the other hand, a women's hair salon developing a line of hair care products is a purveyor of goods and services that seem closely related to hair cosmetics. Therefore, L'Oréal's knowledge of ZHD's use defeats any claim L'Oréal may have to priority.

One of the keys here seems to be the use of ZAZU as a service mark connected with the provision of salon services by ZHD. A service mark can be infringed by its use on

a closely related product.[1] *See, e.g., Re Hyper Shoppes (Ohio), Inc.,* 837 F.2d 463 (Fed.Cir.1988) (affirming refusal to register two "closely related" marks: one for furniture and the other for general merchandise services that included the sale of furniture); *Steelcase, Inc. v. Steelcare, Inc.,* 219 U.S.P.Q. 433 (TMTAB 1983) (mark used for furniture refinishing service likely to be confused with mark used for office furniture); *see also* 2 J. Thomas McCarthy, *Trademark and Unfair Competition* § 24:6, at 71 (2d ed. 1984 & Supp.1991) (stating that "[w]here the services consist of retail sales services, likelihood of confusion is found when another mark is used on goods which are commonly sold through such a retail outlet"). A service and a product are related if buyers are likely to assume a common source or sponsorship. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 612 (7th Cir.1965); 2 McCarthy, *supra,* § 24:6 at 183 ("The 'related goods' test is merely a facet of the ultimate and final test of 'likelihood of confusion.'"). The salon services and hair products at issue in this case, which are nearly as kindred as a service and product can be, offer the paradigmatic illustration of things that are closely related. Thus the majority's disregard for ZHD's substantial use of ZAZU in connection with salon services is unfounded.

As the majority correctly notes, the standard for granting federal registration is somewhat less exacting than that for establishing common law trademark rights. *See La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265 (2d Cir.1974). But that distinction is so slight as to be inconsequential here. While any bona fide transaction that is more than a "mere sham" will, when combined with intent to continue use, suffice to support federal registration, *Avakoff v. Southern*

1. Our recent opinion in *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 24 U.S.P.Q.2d 1001 (7th Cir.1992), states explicitly that modern trademark law prohibits the use of a senior user's mark on products that are closely related to the senior user's, as well as those products in direct competition. *See* 24 U.S.P.Q.2d at 1010; *International Kennel Club, Inc. v. Mighty Star, Inc.,*

846 F.2d 1079, 1089 (7th Cir.1988). This "protects the owner's ability to enter product markets ... into which it might reasonably be expected to expand in the future." *Sands, Taylor & Wood,* 24 U.S.P.Q.2d at 1011; 2 J. Thomas McCarthy, *Trademark and Unfair Competition* § 24:5, at 177 (2d ed. 1984).

*Pacific Co.,* 765 F.2d 1097, 1098 (Fed.Cir. 1985); 1 McCarthy, *supra,* § 19:37 at 967, any use greater than de minimis will still warrant trademark protection in the absence of registration. *See SweeTarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir. 1967) (market penetration "need not be large" but must be "significant enough to pose the real likelihood of confusion"); 1 McCarthy, *supra,* § 16:2(B) at 723; § 16.-2(C) at 726. Thus, bona fide test marketing or small experimental sales—indeed, any use that is not nominal or token—can satisfy the test. *E.I. du Pont de Nemours & Co. v. G.C. Murphy Co.,* 199 U.S.P.Q. 807, 812 (TMTAB 1978); 1 McCarthy, *supra,* § 16:2(B) at 723.

In this case, ZHD's use of the ZAZU mark, both in its highly successful salon service business, which drew some out-of-state clients, and in its local and interstate product sales to customers and to a potential marketer, surely is more than de minimis. The extensive evidence of ZHD's intent to step up hair product sales—such as its order for 25,000 ZAZU-emblazoned bottles and its inquiry about advertising rates in a national magazine—bolsters this assessment. Even if ZHD did fail to demonstrate more than a de minimis market penetration nationally, at the very least it successfully established exclusive rights within its primary area of operation. The salon's substantial advertising, increasing revenue and staff and preliminary product sales indicate sufficient market penetration to afford trademark protection in that region. *See Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383 (3d Cir.) (senior user can establish common law rights in geographic areas where it achieved market penetration), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985); *SweeTarts,* 380 F.2d at 928 (plaintiff's prior use of trademark within a given market area entitles it to exclusive use of that mark within that area); *V & V Food Products, Inc. v. Cacique Cheese Co.,* 683 F.Supp. 662 (N.D.Ill.1988).

L'Oréal concedes that ZHD has exclusive rights to use ZAZU for salon services in the Hinsdale area. Those exclusive rights also preclude L'Oréal from using the mark on hair products in the local area because of the likelihood of confusion between those products and ZHD's salon services, even apart from any confusion between the two parties' *products.* Given the deferential standard of review on the factual question of use, therefore, I think it clear that ZHD has achieved market penetration and exclusive rights to the ZAZU mark at the very least in the Chicago area.

ZHD's contention that its rights in the ZAZU mark extend beyond the local area is enhanced by evidence that L'Oréal did not, as we have noted, act in good faith. The majority's consideration of the good faith issue minimizes the important role good faith plays in trademark disputes, particularly disputes involving unregistered marks. *See* 2 McCarthy, *supra,* § 26:4 at 292 (noting that good faith has "significant, if not independent, importance" in disputes involving unregistered marks). Bad faith can defeat claims to priority. *See, e.g., A.J. Canfield Co. v. Honickman,* 808 F.2d 291 (3rd Cir.1986) (stating the doctrine that a senior user "has enforceable rights against any junior user who adopted the mark with knowledge of its senior use"); *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 876 (E.D.N.Y.1978) (stating that junior users who do not adopt the mark in good faith "will not be accorded the right to exploit the mark, even in areas previously untouched by the senior user"); 2 McCarthy, *supra,* § 26:3 at 289; § 26:4 at 292. Contrary to the majority's narrow characterization of bad faith as a concept employed solely to deter attempts to reserve marks prior to genuine sales, courts have examined junior users' good faith in a variety of contexts. In fact, this court has held that a good faith junior user is simply one that begins using a mark without knowledge that another party already is using it. *The Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 674 (7th Cir.1982); *see* 2 McCarthy, *supra,* § 26:4 at 292 (equating good faith to "the junior user's lack of knowledge"). And while such knowledge may not automatically negate good faith, only the most unusual situations encom-

511

pass both knowledge and good faith. *See GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990).

In sum, I believe ZHD's sale of ZAZU services and products constituted sufficient use to establish exclusive trademark rights in the Chicago area, if not nationally. In any event, L'Oréal's pursuit of its line of hair cosmetics in spite of its knowledge of ZHD's use defeats L'Oréal's position. Therefore, I respectfully dissent.