**Janice L. YUND and Hillary J., Plaintiffs,**

v.

**COVINGTON FOODS, INC., an Indiana Corporation, Defendant.**

**No. IP 99–703–C–Y–/F.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 19, 2000.

Randall B. Gold, Lawrence, Kamin, Saunders & Uhlenhop, Chicago IL, Peggy A. Hillman, Indianapolis, IN, Jonathan D. Karmel, Karmel & Gliden, Chicago, IL, for Plaintiff.

Kenneth J. Yerkes, Barnes & Thornburg Indianapolis, IN, for Defendant.

## ENTRY

### on Plaintiffs' Motion to Compel (doc. no. 23).

FOSTER, United States Magistrate Judge.

This Cause comes before the Court on the plaintiffs' *Motion to Compel Defendant's Responses to Plaintiffs' Interrogatories and Request for Documents* ("Motion") (doc. no. 23) which requests an order compelling Covington Foods to respond to the plaintiffs' interrogatory no. 15 and requests for production nos. 16, 23, 24, and 25 which are in the following terms:

Interrogatory no. 15: State Defendant's gross business revenues and/or profits for each of the years 1997 to date, as well as its operating expenses, net profits and net worth for each of such years.

Request for production no. 16: All documents relating to the balance sheet reflecting the current assets and liabilities and net worth of Defendant, including annual reports, U.S. tax returns for the years 1998 and 1999 to date, and copies of all audited or unaudited financial statements for 1998 to date.

Request for production no. 23: Copies of Defendant's 1998 U.S. and state corporate tax returns.

Request for production no. 24: Copies of all audited and unaudited financial statements concerning Defendant and its business operations for the years 1997, 1998 and 1999 to date (if available).

Request for production no. 25: Copies of all profit and loss statements, operating expenses and capital expense reports or similar documentation concerning Defendant for the period from 1997 to the present, including any period(s) within such time frame[.]

(Motion, Exhibit A).

This Cause is a Title VII employment discrimination action by the plaintiffs against their employer, Covington Foods, alleging sexual harassment by members of Covington Foods' management. The plaintiffs argue that discovery of "financial information and documents as to Defendant's net worth" is relevant to their assessment of an award of punitive damages which they seek as part of their remedy. (Motion, ¶ 3, p. 1–2). Covington Foods objects to the requests on several grounds. First, it argues that its financial status is not a relevant factor in computing punitive damages. Second, it contends that the requests for different types of financial data are overbroad. Third, it argues that disclosure of its financial information is an invasion of privacy and would distract the jury. Fourth, it argues that disclosure of its financial information would be unduly prejudicial and is sought for malicious and unrelated purposes. Finally, Covington Foods argues that, even if its financial information is relevant to the issue of punitive damages, the information is not relevant until after the Court determines that the plaintiffs have made a *prima facie* case for punitive damages, presumably as part of a dispositive motion or specially as part of a discovery motion.

The Court is disappointed in the form and substance of Covington Foods' argument on relevancy:

Although Plaintiffs claim that the discovery requests seek information relating to their claim of punitive damages, Coving-

ton's financial status is not a relevant factor in computing punitive damages. *See BMW of North America v. Gore*, 116 U.S. 1600, 1603 (1996) (defendant's financial status is not a relevant factor in computing punitive damages).

(*Defendant's Response to Plaintiffs' Motion to Compel Financial Information* ("Response") (doc. no. 28), p. 2). As to form, Covington Foods' citation to *BMW of North America, Inc. v. Gore* has the reporter and page wrong: the citation for the United States Reports is 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 and for the Supreme Court Reporter is 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. The substance of the citation is even more troubling, however, because *Gore* does not hold, by any reasonable interpretation or stretch of creative argument, that financial status is not a relevant factor in assessing punitive damages. In fact, *Gore* does not even address the issue.[1] Moreover, in other cases (not cited to us) the Supreme Court has observed that the amount of a defendant's wealth is traditionally held to be relevant and admissible to the assessment of punitive damages. *See, e.g., TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 and n. 28, 464, 113 S.Ct. 2711, 2722–23 and n. 28, 2723, 125 L.Ed.2d 366 (1993); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269, 270 and n. 31, 101 S.Ct. 2748, 2761 and n. 31, 69 L.Ed.2d 616 (1981).

Covington Foods also described the holding of another case as the opposite of what it actually is. Covington Foods argued:

1. That the opinion is silent on the issue is the most that can be gleaned from *Gore*. In support of its ruling that financial condition is irrelevant to punitive damages against a corporation, a district court in the Northern District of Illinois wrote, "It is interesting to note that, even when considering punitive damages based on state law, the Supreme Court [in *Gore*] did not treat the defendant's wealth as relevant." *Pivot Point International, Inc. v. Charlene Products, Inc.*, 932 F.Supp. 220, 223 (N.D.Ill.1996) (Circuit Judge Easterbrook sitting by designation). We do not find *Gore's* failure to mention the relevancy of financial condition noteworthy, especially when there is no indication that either party asserted it as an issue in the case. At any rate, it is inexcusable for Covington Foods to have characterized this silence or "omitted treatment" as a holding of the Supreme Court, particularly in light of the

Because Covington Foods would be unduly harmed by the disclosure of its financial information to Plaintiffs and their counsel, Plaintiffs' motion to compel should be denied. *See e.g., Mid Continent Cabinetry v. George Koch Sons [sic]*, 130 F.R.D. 149, 152 (D.Kan.1990) (denying plaintiff's motion to compel based on potential harm to defendant from disclosure of financial information).

(Response, p. 3). The court in *Mid Continent Cabinetry* actually granted the plaintiff's motion to compel, rejecting the defendant's argument of potential harm from disclosure of its financial information. *Mid Continent Cabinetry, Inc. v. George Koch Sons,* 130 F.R.D. 149, 152, 153 (D.Kan. 1990). Although the court addressed the harm that disclosure can cause, it held that "while a party does have an interest in nondisclosure and confidentiality of its financial records, this interest can be adequately protected by a protective order." *Id.,* at 152. The court recognized that a protective order might not always afford sufficient protection for a party's financial information (giving the example of an action between business competitors) but the court opined that, in such cases, a required *prima facie* showing of entitlement to punitive damages before obtaining discovery might be sufficient protection. However, the court did not find that that issue was presented in that case and it is clearly not presented in this one.[2] Covington Foods'

Court's more direct statements in *TXO Production* and *City of Newport*, discussed *infra*.

2. The only fear Covington Foods asserts is that it will be "unduly harmed by the disclosure of its financial information" because the information "will be used against it for malicious and unrelated purposes as the basis for further organizing attempts" (Response, p. 2–3). It asserts that the plaintiffs are represented by the same attorney who assisted one of them in filing an unfair labor practice charge against it relating to her involvement in a union organizing campaign. Covington Foods asserts that its financial information was a major issue in that organizing campaign. (*Id.,* at 2). It has not suggested a protective order in this case and we are not prepared to accept the characterization that further organizing attempts constitute a "malicious" purpose.

erroneous description of *Mid Continent Cabinetry's* holding is inexcusable.

Finally, Covington Foods got the substance of another citation wrong. It wrote:

> In *Davis v. Palmer Dodge West, Inc.*, No. IP–96–124–C M/S, slip. [*sic*] op. at 2 (S.D.Ind. Jan. 6, 1997), this Court held that a plaintiff is not entitled to an employer's financial information until such time, if ever, that the Court denies the employer's summary judgment motion and determines that plaintiff has made a factual showing that a prima facie case for punitive damages [*sic*].

(Response, p. 3) (a copy of the *Davis* Entry was attached to the Response as Exhibit 1). Magistrate Judge Shields ruled in *Davis* that a corporate defendant's financial condition was relevant and discoverable on the issue of punitive damages but she stayed the discovery until after the Court ruled on the defendants' motion to dismiss and motion for summary judgment. *Davis v. Palmer Dodge West, Inc.*, No. IP 96–124–C–M/S, *Entry on Plaintiffs' Amended Motion to Compel*, Slip Op. at 4–5, 6 (S.D.Ind., Jan. 6, 1997). In no part of her opinion does Judge Shields mention or suggest that a *prima facie* showing of entitlement to punitive damages is a prerequisite to obtaining discovery of a defendant's financial condition.

Although counsel should be creative and strong advocates for their clients, their first responsibility is to accurately inform courts of the law that applies to, and especially that governs,[3] the issues in a case. Inaccuracies and omissions not only diminish counsel's and their clients' credibility and persuasiveness in the case at hand, it also disserves the bar, other litigants, and the interests of judicial efficiency in general because courts will tend to be less willing to rely on the submissions of counsel in other cases. Covington Foods' counsel's significant errors on this motion naturally incline us to suspect its future arguments and representations in this Cause. We expect counsel to carefully consider this admonition.

As noted above, the Supreme Court in *TXO Production* and *City of Newport* recognized that evidence of a defendant's wealth is traditionally considered relevant and admissible when assessing punitive damages. *TXO Production*, 509 U.S. at 462 and n. 28, 464, 113 S.Ct. at 2722–23 and n. 28; *City of Newport*, 453 U.S. at 269, 270 and n. 31, 101 S.Ct. at 2761 and n. 31. *TXO Production* was a suit between two corporations and involved the question of whether the amount of punitive damages awarded by a state court on a state cause of action was so grossly excessive that it violated the Due Process Clause of the Fourteenth Amendment. The Court held that, considering several factors including "petitioner's wealth", the amount awarded did not violate Due Process. *TXO Production*, 509 U.S. at 462, 113 S.Ct. at 2722. In rejecting the petitioner's argument that the admission of evidence of its "impressive net worth" resulted in an award based on passion and prejudice, the Court wrote:

> Under well-settled law, however, factors such as these [evidence of wrongdoing in other parts of the country and net worth] are typically considered in assessing punitive damages. Indeed, the Alabama factors we approved in *Haslip* included both. *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21–22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991) ("(b) ... the existence and frequency of similar past conduct; ... (d) the 'financial position' of the defendant").

*Id.*, 509 U.S. at 462 n. 28, 113 S.Ct. at 2722 n. 28. In *City of Newport*, the Court held that municipalities are not liable for punitive damages under § 1983 in part because of the potential for improper influence if evidence of municipalities' available wealth were introduced:

> Because evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded,[31] the unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. The

---

**3.** *See Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 762 (7th Cir.1992) ("We often benefit by citing and utilizing decisions from courts other than our own, but, where there is controlling authority within this circuit, it must be cited.").

impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial, and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large.

---

31. See Restatement (Second) of Torts § 908(2) (1979); D. Dobbs, Law of Remedies § 3.9, pp. 218–219 (1973).

*City of Newport,* 453 U.S. at 270–71, 101 S.Ct. at 2761–62 (footnote omitted).

■ However, in two recent cases, the Court of Appeals for the Seventh Circuit has written that evidence of a defendant's wealth should be irrelevant to the assessment of punitive damages, *Kemezy v. Peters,* 79 F.3d 33, 35–36 (7th Cir.1996), at least for corporate and institutional entities, *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 508–09 (7th Cir.1992). After careful examination of these cases, we conclude that *Zazu Designs'* statements are more than mere theorizing—they are controlling precedent on this issue and are supported by *Kemezy.*

In *Zazu Designs,* the first case decided, the Seventh Circuit reversed a district judge's award of compensatory and punitive damages for violation of federal and state trademark laws. In part I of its opinion, the Court ruled that the evidence was insufficient to establish the defendant's liability, thus rendering all damages improper. In part II of its opinion, the Court separately addressed

the damages award, which it described as "[a] second, and independently sufficient, error [that] requires us to set aside the judgment." *Id.,* at 505. The Court held that the compensatory portion of the damages was based on only conjecture and that the standard for punitive damages[4] was not met because the defendant's alleged trademark infringement was not wilful, *id.,* at 507, likely to evade detection, or wholly antisocial, *id.,* at 508.[5] However, the Court found that the district judge's award of "punitive damages" was better justified as a sanction for the defendant's litigation misconduct[6] rather than as part of the plaintiff's remedy for its infringement claims. *Id.,* at 507–08. The district judge gave both remedial and sanction reasons for awarding punitive damages but did not divide the award between each purpose. *Id.,* at 507 ("The district court found that [the defendant] had wilfully infringed [the plaintiff's] mark and that 'its conduct before and during the litigation ha[d] been oppressive and deceitful'").

Analyzing whether the sanction for the defendant's litigation misconduct could include a punitive as well as a compensatory component, the Court applied the same standard by which it evaluated whether the remedial award for the defendant's trademark infringement could include a component of punitive damages, *viz.,* whether the conduct was likely to evade detection or was wholly antisocial.[7] *Id.,* at 508. The Court held that

---

4. The Court noted that punitive damages are not available under federal trademark law but assumed that they are under state trademark law. *Zazu Designs,* 979 F.2d at 507. Its discussion of the standard for punitive damages was generic and did not note any difference between federal and state law.

5. "One million dollars cannot be justified as necessary to either compensation or deterrence. The judge discussed neither. Instead he calculated the award as a percentage of L'Oréal's (supposed) net worth—as if having a large net worth were the wrong to be deterred! Punitive damages are appropriate when some wrongful conduct evades detection; a multiplier then both compensates and deters. Punitive awards also are appropriate when the conduct in question is wholly antisocial, for then excessive awards cannot deter borderline conduct that may be beneficial. Some trademark infringements are concealed; for example, passing off a lower quality product under a copy of another's mark. L'Oré-

al's conduct, however, was not of this type. L'Oréal did not try to palm off its product as ZHD's, and there was little chance that L'Oréal's national advertisements and sales would escape notice. L'Oréal's use was not only easily detected but also in the class of potentially beneficial uses that could be discouraged by excessive awards. So, too, its conduct of the litigation was well known to ZHD. Employing L'Oréal's net worth as the starting point did not help the court identify concealable offenses and may have misled it about the appropriate size of the award." *Zazu Designs,* 979 F.2d at 508 (citation omitted).

6. The Court noted that the sanctions might have been imposed pursuant to contempt of court, Fed.R.Civ.P. 11, 28 U.S.C. § 1927, or the court's inherent power.

7. The term "punitive damages" is used in three senses in *Zazu Designs.* It is used in the commonly understood sense to refer to an amount of

the defendant's litigation misconduct was not likely to have evaded detection but it did not address whether the misconduct was wholly antisocial, *id.*, thus technically leaving open the question of whether a sanction award could include a component of punitive damages. There is no doubt, however, that the defendant's litigation misconduct was wholly antisocial and therefore warranted a punitive award.[8]

This is the point: although the Court reversed the finding of liability and the award of punitive damages for the infringement claims, its subsequent holding that a corporation's financial condition is not relevant to the assessment of punitive damages cannot be considered as *dictum* because the Court also held that a sanction award was appropriate which could include a punitive or deterrent

element under the same punitive damages standard that applies to ordinary damages.[9]

In this last part of *Zazu Designs*, the Court explained that the law of diminishing marginal utility which supports the relevance of a natural person's wealth to the assessment of punitive damages against him, does not apply to corporations because they are abstract or artificial entities whose wealth is actually owned by their stockholders who might, directly or indirectly, number in the millions and be of only average wealth. In essence, because corporations are not wealthy as natural persons are wealthy, the marginal utility of punitive damages does not decrease as the size, or "wealth", of the corporation increases. Therefore, a corporation's net worth is irrelevant to the assessment of punitive damages against it. *Id.*, at 508–09.[10] *See TXO Production,* 509 U.S. at

---

damages awarded in excess of compensatory or actual damages in order to punish and deter the conduct alleged in the complaint. When parsing the district judge's ambiguous award of "punitive damages", the Court also gave the term a broad construction to mean a penalty in general, including sanctions for litigation misconduct. Finally, when the Court discussed whether it was appropriate to include punitive as well as compensatory damages as part of a sanction for litigation misconduct, the Court used the term narrowly to mean that part of any monetary award that is intended to deter misconduct.

8. The Court upheld the district judge's findings that the defendant (1) deceived the court about the amount of its allegedly infringing sales in order to increase the size of the plaintiff's injunction bond; (2) misrepresented its net worth to the plaintiff and the court in order to evade hefty punitive damages; (3) made false statements to the Trademark Office; and (4) unethically tried to negotiate directly with the plaintiff's partners instead of its counsel. *Zazu Designs,* 979 F.2d at 507. Wholly antisocial conduct is required so that excessive awards will not deter borderline conduct that might be beneficial, *id.*, at 508; *Federal Deposit Insurance Corp. v. W. R. Grace & Co.,* 877 F.2d 614, 623 (7th Cir.1989), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990), and these instances of intentional "oppressive and deceitful" litigation tactics are the very types of socially valueless conduct that warrant the imposition of punitive sanctions. *See F.D.I.C.,* 877 F.2d at 623 ("[P]unitive damages provide surer deterrence than actual damages of conduct that we very much want to deter because it is highly anti-social. Fraud, a form of intentional wrongdoing is in that category.").

9. The Court remanded the case "so that the district court may consider *whether* a sanction is

appropriate for [the defendant's] misconduct during the litigation." *Zazu Designs,* 979 F.2d at 509 (emphasis added). Although the district judge found that the defendant's conduct during the litigation had been "oppressive and deceitful", thus justifying an award of sanctions, the court made only a general award of "punitive damages" without articulating his calculation or division between sanction and the judgment on the claims. The imposition of a monetary award as a sanction is discretionary, as is the decision to include compensatory and punitive components in the award; however, a judge is required to explain the calculation of the sanction that is imposed. *Id.*, at 508 ("A judge sanctioning misconduct may not draw a number from the Æther but must explain the choice by reference to its role in compensating the wronged party or deterring conduct that injures the judicial system.... After *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), courts should be especially careful to justify the level of punitive awards."). Rather than indicating that a sanction (compensatory and/or punitive) might not be justified, the remand for the district judge to determine *whether* a sanction is appropriate is better interpreted as reflecting the Court's belief that, without an articulated rationale and calculation by the district judge, it is uncertain whether he undertook the required analysis or exercised the appropriate discretion. After doing so in the light of the Seventh Circuit's discussion of the applicable standards, the district judge might yet decide not to impose a monetary sanction or might award only a compensatory sanction.

10. The Court noted one circumstance where corporate wealth might be relevant: "Corporate size is a reason to magnify damages only when the

491, 113 S.Ct. at 2737 (O'Connor, White, and Souter, JJ., dissenting) ("To be sure, there are strong economic arguments that permitting juries to consider wealth is unwise if not irrational ... especially where the defendant is a corporation" (citing *Zazu Designs*)); 1 *Dobbs Law of Remedies* § 3.11(5), p. 489–91 (2d ed., 1993) (if purpose of punitive damages is retribution, then net worth is relevant; if purpose is deterrence, then net worth is at best only remotely relevant and perhaps not relevant at all).

A little over three years later, the Court explained that wealth should be considered irrelevant to the assessment of punitive damages even against natural persons, but it did not make this opinion a holding. *Kemezy*, 79 F.3d at 35–36 ("Juries, rightly or wrongly, think differently, so plaintiffs who are seeking punitive damages often present evidence of the defendant's wealth"). However, citing *Zazu Designs,* the Court reiterated that the principle of diminishing marginal utility does not apply to institutions as distinct from natural persons, *id.,* at 35, and a court may therefore refuse to admit evidence of a defendant's wealth for the purpose of assessing punitive damages, *id.,* at 36. Although these statements are *dicta* because *Kemezy* involved a natural person defendant, they indicate the Court's view of *Zazu Designs* as precedent.

*Zazu Designs'* holding is not inconsistent with the Supreme Court's recognition in *TXO Production* and *City of Newport* that a defendant's wealth is traditionally deemed relevant to the issue of punitive damages. Although punitive damages against a corporation was at issue in *TXO Production,* the Supreme Court was engaged in a Constitutional analysis of the excessiveness of a state court award of punitive damages. Considering several factors, including the petitioner's wealth, the Court determined that the punitive award was not so "grossly excessive" that it violated due process. *TXO Production,* 509 U.S. at 462, 113 S.Ct. at 2722. But the Court's consideration of the evidence of the petitioner's wealth, which was admitted over the petitioner's objection, as an indicator of constitutional excessiveness cannot be stretched into a holding that such evidence is relevant and admissible by plaintiffs for the purpose of persuading fact-finders to increase punitive damages. At best, it might support the relevancy of wealth evidence introduced by defendants at trial to persuade juries to award low punitive damages or after trial to persuade judges that juries awarded excessive punitive damages. In a footnote, the Court observed that evidence of a defendant's wealth "[is] typically considered in assessing punitive damages", *id.,* at 462 n. 28, 113 S.Ct. 2711, but the question at issue was whether the admission of wealth evidence led the jury to base its award on passion and prejudice. The Court did not hold that wealth is relevant and it did not address the question of ·the relevance of wealth to punitive awards against corporations or other institutions.

Likewise in *City of Newport,* although the Court observed that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of ·punitive damages that should be awarded", *City of Newport,* 453 U.S. at 270, 101 S.Ct. at 2761, its observation was not a holding and was not necessary to its decision. The Court held that punitive damages are not available against a municipality under § 1983 because its unlimited taxing power—*i.e.,* it unlimited wealth— would likely lead to passion and prejudice by the jury, "in effect encouraging it to impose a sizable award." *Id.* But corporations and other institutions do not have unlimited wealth and do not have the unique governmental responsibilities and powers that carry additional public interest weight in the development of legal standards. In addition, the Court cited the Restatement of Torts and the treatise *Dobbs Law of Remedies* in support of it observation of the traditional admissibility of wealth evidence, *id.,* at 271 n. 31, 101 S.Ct. 2748, but, as noted above, the latest edition of the treatise states that net worth is at best remotely relevant and perhaps not relevant at all to punitive damages and the Restatement of Torts does not distinguish

wrongs of larger firms are less likely to be punished; yet judges rarely have any reason to suppose this, and the court in this case had none."

*Zazu Designs,* 979 F.2d at 509. The plaintiffs did not make this argument in their motion.

between natural person defendants and corporate defendants when discussing the relevance of wealth to punitive damages and does not address the applicability of diminishing marginal utility to institutional defendants, Restatement (Second) of Torts § 988(2) (1979).

Therefore, although *TXO Production* and *City of Newport* both recognized that wealth is commonly deemed relevant to the assessment of punitive damages, we conclude that neither case so holds as a matter of controlling law that conflicts with *Zazu Designs*.

### Conclusion.

The plaintiffs seek discovery of the defendant's net worth "in order for Plaintiffs to assess their claim for punitive damages." (Motion, ¶ 3, p. 1–2). Because *Zazu Designs* holds that a corporate defendant's net worth is irrelevant to the assessment of punitive damages against it, the plaintiffs' motion to compel is **DENIED**.